**Thomas F. CARTER and Carter Electronics Corporation, Appellants,**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY et al., Appellees.**

**Thomas F. CARTER and Carter Electronics Corporation, Appellants,**

v.

**Honorable Joe E. ESTES, Chief Judge, United States District Court, Northern District of Texas, et al., Appellees.**

**Nos. 23556, 23557.**

United States Court of Appeals
Fifth Circuit.

Aug. 17, 1966.

Ray Besing, Ray Pearce, William Van-Dercreek, Bill Brice, Geary, Brice & Lewis, Dallas, Tex., for appellants.

Leroy Jeffers, Houston, Tex., Frank M. Ryburn, Jr., H. W. Strasburger, H. Sam Davis, Jr., Burford, Ryburn & Ford, Dallas, Tex., for appellees.

Before BROWN and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

JOHN R. BROWN, Circuit Judge:

At issue here is whether a District Court in a private antitrust action for triple damages and injunctive relief should invoke the doctrine of primary jurisdiction to refer a question of tariff validity to the regulatory agency. It comes to us from a denial of a preliminary injunction. We agree with the District Court's primary jurisdiction reference to the Federal Communications Commission and affirm.

## I.

At the outset we conclude that we have jurisdiction of the appeal under 28 U.S.C.A. § 1292(a) (1) as a denial of a preliminary injunction and the Telephone Company's motion to dismiss the appeal must accordingly be denied.

We need only briefly sketch the chronology. The complaint, filed November 29, 1965, was accompanied by a separate formal motion for preliminary injunction. The plaintiffs-appellants requested an early setting which would include the application for preliminary injunction. Thereafter by an exchange of letters among counsel and the Court and an informal pretrial conference in mid-December, the Judge extended the time for the defendants' responsive motions or answers to January 14, 1966. The defendants filed a motion to dismiss on the dual ground (a) asserting primary jurisdiction in the FCC and (b) failure to state a claim. The Court subsequently fixed a hearing for February 7, 1966, and by the Court's direction, this hearing was to be (and was) confined to the motions to dismiss. At the conclusion of the extended hearing February 7, the Judge announced orally his decision denying the motion to dismiss for failure to state a claim, but holding the case in abeyance until determination of the tariff's validity by the FCC. This was followed February 8 by a formal written memorandum order. Subsequently on February 16, the plaintiffs-appellants filed separate motions for rehearing and for a hearing on the motion for preliminary injunction. On February 24, each motion was denied.[1]

Thus there is no doubt that both by the initial prayer in the complaint and by formal motion, the plaintiffs-appellants sought a preliminary injunction. Equally uncontradicted is the fact that such injunction was not granted. But, appellees argue, it is not that simple. On their theory, the Court having on February 8 put the case in abeyance pending reference to the FCC, the application for preliminary injunction was but a part of the case thus deferred, for the Court did not deny the preliminary injunction, only the hearing thereon. Consequently, the argument runs, the formal motion for a preliminary injunc-

---

1. The order as to preliminary injunction stated:
   "Having duly considered Plaintiffs' Motion for Hearing on Preliminary Injunction filed herein on February 16, 1966, the Court is of the opinion that for the reasons stated in its Memorandum Order entered herein on February 8, 1966, such Motion should be and is hereby DENIED."

tion was but a paper means of casting the primary jurisdiction reference ruling into an appealable form and not, as it really was, a mere stay order. This rests, in turn, on the generally accepted proposition that orders merely staying further action pending some event are not generally appealable.[2]

■ On this reading, the Judge was simply declining to entertain any requests until after the reference. But we read it differently. In the colloquy at the end of the February 7 hearing the Judge made it plain that the plaintiffs could file and he would consider all motions desired. The Judge did not treat the reference order as a ground merely for not *considering* the request for preliminary injunction. Rather, he treated the reference order as the *reason* why the injunction should be denied. It is, of course, the denial of a preliminary injunction, not the validity of the reasons therefor, which triggers the interlocutory appeal as a matter of right under § 1292(a) (1). Our conclusion is not in any sense at odds with Allied Air Freight, Inc. v. Pan American World Airways, 2 Cir., 1965, 340 F.2d 160, cert. denied, 381 U.S. 942, 85 S.Ct. 1560, 14 L.Ed.2d 683, or American Airlines, Inc. v. Forman, 3 Cir., 1953, 204 F.2d 230, cert. denied, American Airlines, Inc. v. Slick Airways, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336. In *Allied Air Freight* the unsuccessful plaintiffs in a triple damage action (not injunction) sought to make the stay a vicarious granting of a preliminary injunction. On familiar principles, see note 2, supra, this would not work. In *American Airlines* the defendant sought to appeal from a denial of its motion to dismiss on the ground that primary jurisdiction was in the CAB. Not unexpectedly the Court of Appeals found no appealable order and also denied relief by mandamus.

■ The serious question of primary jurisdiction reference is therefore properly before us.[3]

## II.

In analyzing the plaintiffs' complaint, it is well to bear in mind their blunt, bold position. The appellants claim that the trial Court by applying the doctrine of primary jurisdiction has effectively precluded them from obtaining the antitrust relief which they seek. Further, it is their position that the doctrine of primary jurisdiction does not apply because administrative agency approval does not immunize the Telephone Company's conduct from the operation of the antitrust laws, especially where the violation of those laws is claimed to be *per se* since an administrative determination of reasonableness would be irrelevant, and because there are no issues relevant to a disposition of the case at bar which require administrative expertise for their determination.

The complaint sought triple damages and injunctive relief under the antitrust laws. 15 U.S.C.A. §§ 15, 22. Only two defendants were named and served, A.T.

2. Republic of China v. National City Bank, 2 Cir., 1952, 194 F.2d 170; Brande v. S & S Mach. Co., 2 Cir., 1958, 252 F.2d 297; International Nickel Co. v. Martin J. Barry, Inc., 4 Cir., 1953, 204 F.2d 583; United Gas Pipeline Co. v. Tyler Gas Serv. Co., 5 Cir., 1957, 247 F.2d 681; Jackson Brewing Co. v. Clarke, 5 Cir., 1962, 303 F.2d 844, cert. denied, 371 U.S. 891, 83 S.Ct. 190, 9 L.Ed.2d 124; United States v. Richardson, 5 Cir., 1953, 204 F. 2d 552; 6 Moore, Federal Practice, § 54.07.

3. The companion case for mandamus (No. 23,557) is dismissed as is the effort to appeal the February 8 stay order after denial of certification by the trial Court under 28 USCA § 1292(b). With the flexibility given § 1292(b) by this Circuit, unlike some others, Hadjipateras v. Pacifica S.A., 5 Cir., 1961, 290 F.2d 697; Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873; Ex parte Tokio Marine & Fire Ins. Co., Ltd., 5 Cir., 1963, 322 F.2d 113, the interlocutory certification method has many attractions in primary jurisdiction reference situations. Since the Court of Appeals must affirmatively allow a 1292(b) appeal, it affords a very early look-see as to whether in the given situation the primary reference order will ultimately be sustained in all likelihood.

&T. and General.[4] These two along with 26 other named, but nonparty, telephone companies, 19 of which are owned and controlled by A.T.&T. were alleged to have jointly and severally conspired as a part of a common design to prevent the plaintiffs from marketing and distributing their Carterphone device.

The Carterphone, developed by the individual plaintiff Carter and manufactured and distributed by the corporate plaintiff, Carter Electronics, is a device for use with the traditional telephone handset. When in use, the telephone receiver handset is placed on a cradle which forms part of the Carterphone unit and by the process of induction, without any electrical connection or wiring or physical attachment, the Carterphone unit activates a two-way radio communication system to permit the telephone caller to converse with another person who may be located miles away from the telephone receiver handset. Similarly, the device works in the opposite direction to permit further transmission by land-lines of voice signals originating by mobile radio transmitter.

A substantial market throughout the United States has been developed competing in the product-relevant-market of the manufacture and sale of devices permitting private subscribers from regulated telephone companies to transmit telephone calls to and from points beyond the handset. Despite this economic demand the defendant Telephone Companies acting in concert with one or more or all of the named nonparties have taken concerted action to monopolize interstate commerce. These Telephone Companies sell and lease mobile radiotelephone units to their subscribers throughout the United States. These mobile units perform a function essentially similar to that afforded by the Carterphone and thus both are directly competitive. In violation of the antitrust laws, the Telephone Companies are undertaking to exclude the plaintiffs and other similar competitors from manufacturing or selling devices which would compete with Telephone Company-furnished mobile units.

To bring this about the Telephone Companies as sellers and lessors have required private subscribers, as buyers and lessees, not to deal with the Carterphone unit. Such requirements, conditions and understandings constitute concerted action which have no reasonable purpose but which do have a damaging effect on competition. The Telephone Companies with the specific intent to restrain trade and commerce have deliberately and purposefully issued instructions to their agents and those of the nonparty Telephone Companies to forbid the use of the Carterphone device by their private subscriber customers. Each of the Telephone Companies, due to its size and economic resources, has both the power to control the prices of competitive communication devices and the power to exclude competitors. The Telephone Companies in conspiracy and combination with each other as well as the named nonparty companies have exercised their economic power within the relevant market to require their customers to refrain from purchasing or using the Carterphone.

At this point in the complaint, the plaintiffs, wisely we think, anticipated the matter of regulatory tariffs. They expressly allege in Paragraph XI that the Telephone Companies "in order to accomplish the violation of the federal antitrust laws heretofore set forth, have published a regulatory tariff which purports to prevent the use of a device similar to the Carterphone * * *. Such tariffs are similar or identical to * * AT&T tariff FCC No. 132," a copy of

4. American Telephone and Telegraph Company, and the General Telephone Company of the Southwest.

which was annexed to the complaint "and incorporated herein." [5]

The plaintiffs then go on to allege that "although the Plaintiffs deny that such tariff is a valid tariff and that such tariff is applicable to the Carterphone, regardless of its validity and its application," the Telephone Companies "have, as a part of a common design and scheme, in uniformly publishing and enforcing such tariff, wrongfully used such tariff to accomplish a violation of the antitrust laws of the United States. Such tariff does not and may not author-ize or excuse the aforementioned violation of the antitrust laws * * *."

Then followed a brief description of the damage suffered because a large number of orders for Carterphones had been cancelled by customers and dealers due to the conduct of the Telephone Companies. The formal prayer for injunctive relief, broad and sweeping in its terms, would forbid enforcement or application of Tariff No. 132.[6]

■ On the basis of the complaint, tariffs, regulations, and agency orders of which it could take judicial knowledge,[7] the District Court held that "pri-

---

5. Tariff FCC No. 132:
"MESSAGE TOLL TELEPHONE SERVICE
"B. GENERAL REGULATIONS (Cont'd)
"7. *Unauthorized Attachments or Connections*
"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with the facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this Tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to remove or disconnect the same; or to suspend the service during the continuance of said attachment or connection; or to terminate the service."
Though the tariff was amended in response to the Commission's order in Hush-A-Phone Corp. v. American Tel. & Tel. Co., No. 9189, FTC, Feb. 6, 1957, following the decision in Hush-A-Phone Corp. v. United States, 1956, 99 U.S.App.D.C. 190, 238 F.2d 266, to permit the attachment of devices similar to the Hush-A-Phone for the convenience of the user, the prohibition on non-furnished equipment such as the Carterphone was carried forward in the concluding paragraph of Section B. 24:
"Except as otherwise provided in this tariff, nothing herein shall be construed to permit the use of a recording device, or of a device to interconnect any line or channel of the Telephone Company with any other communications line or channel of the Company or of any other person."
See FCC Public Notice No. 57–518, May 15, 1957.
It rounds out the tariffese that the interconnection privileges "otherwise provid-ed in this tariff" (§ B. 24, supra) do not purport to touch the Carterphone or similar devices. Tariff FCC No. 132 sections which allow interconnections under certain conditions are as follows: § B. 25 (connections with facilities of power, pipe line, and railroad companies pursuant to Tariff FCC No. 134) ; § B. 26 (connections with experimental satellite facilities through connecting equipment provided by the telephone company) ; § B. 247 (connection with N.A.S.A. installations pursuant to Tariff FCC No. 134) ; § B. 28 (connections with certain facilities of the U.S. Army, Navy, and Air Force provided the appropriate Secretary of such Department certifies that connection is required by reasons of military necessity) ; § J (service through miscellaneous common carriers utilizing telephone company intraexchange equipment).

6. The prayer was for a permanent order "enjoining the defendants * * * from interfering with, harassing or preventing the sale and distribution of the Carterphone * * *" and "from threatening or intimidating any customer or prospective customer * * * with the curtailment * * * or removal of such customers' telephone service and from "directly or indirectly suggesting or advising the customers, prospective customers, and users of the Carterphone device that the use of such device may subject said persons * * * to any loss of * * * the telephone service provided by * * * [the telephone companies] * * *."

7. Interstate Natural Gas Co. v. Southern Cal. Gas Co., 9 Cir., 1953, 209 F.2d 380 ; Fletcher v. Jones, 1939, 70 App.D.C. 179, 105 F.2d 58, cert. denied, 308 U.S. 555, 60 S.Ct. 116, 84 L.Ed. 467 ; Greeson v. Imperial Irr. Dist., 9 Cir., 1932, 59 F.2d 529.

mary jurisdiction" is "vested in the" FCC "to resolve all questions relating to the justness, reasonableness, validity, and effect of the tariff and practices complained of." The Court accordingly stayed further proceedings but recognized "that jurisdiction remains in the Court to pass ultimately upon the antitrust issues."

### III.

No matter from what vantage viewed, the conclusion is unerringly indicated that this was a case permitting, indeed requiring, primary jurisdiction reference to the FCC.

■ Our principal difficulty in the case comes from the fact, made quite clear in the probing from the bench, that we simply do not understand the theories the plaintiffs so earnestly press. We can accept their insistence that the Telephone Companies read the complaint too narrowly in their argumentative effort to confine its total claim to Par. XI, see text accompanying note 5, supra, which affirmatively brings in and challenges AT&T Tariff FCC No. 132, note 5, supra. But both from the formal allegations of the complaint, and more so from a broader consideration of the very nature of the case,[8] the tariff is inescapably at the center of this controversy.

It is here that their position becomes an enigma wrapped in a mystery. After formally denying validity or inapplicability of Tariff No. 132 in Par. XI (note 5, supra), in a number of ways and at endless times throughout the briefs to us they assert that they "have not attacked the reasonableness or validity" of the tariff "as a regulatory measure," and they "are quite content to assume, for the purposes of this appeal, that the tariff is valid under agency standards, but" they add, "not under antitrust standards."[9] Struggling as we do to divine their theory, we see two possibilities. The first is their repeated insistence that, as pleaded, this is a case of a concerted refusal to deal, and as such is a classic *per se* violation of the antitrust laws. The second, perhaps, is that this is an instance of the Arnall attack on the primary monopolistic purpose of an industry-wide adoption of a restrictive tariff. Georgia v. Pennsylvania R. R., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051. But neither of these, alone or together, rule out the tariff as a critical issue.

■ As to the first, the theory is really question-begging, for while concerted refusal to deal is a *per se* violation,[10] the extent and nature of the regu-

---

8. The primary jurisdiction problem is not to be approached with any narrow, technical pleading point of view. As is well stated by McGovern, Types of Questions Over Which Administrative Agencies Do Not Have Primary Jurisdiction, 13 ABA, Antitrust Section 57, 66–67 (1958):

  "The doctrine of primary jurisdiction was not conceived as a shield to relieve regulated industries from all responsibility under the antitrust laws for their unlawful conduct. But neither does the addition of the epithet 'conspiracy' to an agreement for concerted activity approved by an agency automatically convert an otherwise lawful agreement into an unlawful contract and combination under the antitrust laws. The purpose of the doctrine of primary jurisdiction in this field is not merely to place a premium upon pleading skills but rather to evaluate whether the critical issues posed in the antitrust

case actually fall within the policymaking competence of the regulatory agency."

  Indeed, what was denominated a motion to dismiss because primary jurisdiction was in the FCC was, in effect, transmuted by the Court into a motion to require, and a stay pending, reference to the FCC. See 3 Davis, Administrative Law § 19.07, at 42–44 (1958 ed.).

9. Appellants' Brief, p. 31.

10. Appellants vigorously press: Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 1961, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Klors, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Fashion Originators'

lation of a regulated industry may make such concerted action legal.[11] Keogh v. Chicago & Northwestern Ry., 1922, 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183, 187. This contention in effect therefore anticipates the ultimate deci-

sion of the FCC [12] and later the Antitrust Court as to the validity and significance of the tariff.[13] The same is really true as to the second, since it is difficult to believe that the FCC, from the communication-utility-point of view, could uphold

Guild of America v. FTC, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, affirming 2d Cir. 1940, 114 F.2d 80.

11. In Silver v. New York Stock Exchange, 1963, 373 U.S. 341, 83 S.Ct. 1246, 10 L. Ed.2d 389, the Supreme Court made this clear beyond doubt. First, the Court recognized that under the cases relied on by appellants here, see note 10, supra,

> "It is plain, to begin with, that removal of the wires by collective action of the Exchange and its members would, had it occurred in a context free from other federal regulation, constitute a per se violation of § 1 of the Sherman Act."

373 U.S. at 347, 83 S.Ct. at 1252, 10 L. Ed.2d at 394, but the Court went on to state that "[i]n this case, however, the presence of another statutory scheme, that of the Securities Exchange Act of 1934, means that such a conclusion is only the beginning, not the end, of inquiry," 373 U.S. at 349, 83 S.Ct. at 1252, 10 L.Ed. 2d at 395. Pinpointing the problem as being one of reconciling the aims of the antitrust laws with the policies of the Securities Exchange Act, after analyzing these policies the Court found no legislative intention to immunize completely the exchange's actions from the operation of the antitrust laws. See note 25, infra. But the Court made clear that the absence of total immunity does not automatically mean that actions in a regulated industry are to be judged by per se standards in applying the antitrust laws:

> "But, under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act. * * * Although * * * the statutory scheme of that Act is not sufficiently pervasive to create a total exemption from the antitrust laws, * * * it is also true that particular instances of exchange self-regulation which fall within the scope and purposes of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim."

373 U.S. at 360–361, 83 S.Ct. at 1259, 10 L.Ed.2d at 402.

12. When used throughout the expression FCC order, etc. refers to the first decision thereon after appropriate judicial review.

There are two methods of obtaining judicial review of an FCC decision provided by the Communications Act, 47 U.S.C.A. § 402. For reference to this special statutory review provision and for supplementary methods of review, see § 10(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(b). Under § 402 the method of review depends on the kind of decision sought to have reviewed. Decisions granting, denying, modifying and revoking designated permits and licenses, and § 312 cease and desist orders are reviewable exclusively by the Court of Appeals for the District of Columbia. 47 U.S.C.A. § 402(b). Proceedings seeking to enjoin, set aside, annul, or suspend any other orders of the FCC must be brought pursuant to the Administrative Orders Review Act of 1950 (Hobbs Act), 5 U.S.C.A. § 1031 et seq., 47 U.S.C.A. § 402(a), in the circuit where the petitioner resides or has its principal office or in the District of Columbia Circuit. 5 U.S. C.A. § 1033. See generally 3 Davis, Administrative Law § 23.03, at 305. It thus appears that judicial review of the FCC's determination of the validity and applicability of Tariff No. 132 would follow this second method. See, e. g., Hush-A-Phone Corp. v. United States, supra. Therefore, it is possible that the review of the FCC's determination and the review of the Antitrust Court's subsequent decision may be by different Courts of Appeals. This is to be contrasted to the situation where a District Court refers a matter to the ICC under the primary jurisdiction doctrine. There the statute expressly provides that "the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend * * * any order * * * arising out of such referral." 28 U.S.C.A. § 1336; see Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873, 885 n. 35.

13. See 3 Davis, Administrative Law § 19.-05, at 25:

> "* * * [T]he problem is not one of application of the antitrust laws but is one of accommodation of the antitrust policy to the regulatory policy. * * * The courts are obviously well equipped to make initial decisions involving application of the antitrust policy. But, before the particular regulatory agency

as "just and reasonable," 47 U.S.C.A. § 201(b), 205, a tariff proved to have been brought into being by a concerted action whose aim was monopolistic, not the maintenance or improvement of telephone service.

The extravagant brandishing of antitrustees, the repetition of inflammatory epithets of combination, conspiracy, concerted action, monopolistic aim, the frequent incantation of the antitrust laws, and the fervent desire to keep the case for jury resolution in a Federal Court cannot either extinguish the Communications Act of 1934 or erase Tariff No. 132 as a significant, if not decisive, factor.

The starting point is the Communications Act of 1934, 47 U.S.C.A. § 151 et seq. The National communications policy is broadly stated "to make available * * * to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges * * *," 47 U.S. C.A. § 151. The execution of the statutory scheme is committed to the FCC. And this structure, with infinite detail, undertakes to subject communication utilities to refined and comprehensive regulation.

To achieve these goals, the Communications Act grants a broad range of powers to the Federal Communications Commission. 47 U.S.C.A. §§ 201-222. The Commission has the power to require a telephone company to furnish "service upon reasonable request therefor," and, where the Commission "finds such action necessary or desirable in the public interest," to require interconnection with other carriers at rates set by the Commission after opportunity for hearing. 47 U.S.C.A. § 201(a). "All charges, practices, classifications, and regulations" of telephone companies "shall be just and reasonable;" "unjust or unreasonable" charges are unlawful, 47 U.S.C.A. § 201(b). The Commission has

the power to prescribe such rules and regulations as are "necessary in the public interest" to carry out the provisions of the Act. 47 U.S.C.A. § 201(b). To this end, the Commission has promulgated 493 pages of regulations governing the common carrier services provided by telephone companies. 47 C. F.R., Parts 20–69. It is unlawful for a telephone company to discriminate in any "unjust or unreasonable" manner in its "charges, practices, classifications, regulations, facilities, or services." 47 U.S. C.A. § 202(a). Each telephone company is required to file with the Commission, and keep open for public inspection, tariffs setting forth its charges, classifications, regulations, and practices. 47 U.S.C.A. § 203(a). Such tariffs must be followed until such time as they are amended in the manner provided by the statute. 47 U.S.C.A. § 203(b). A telephone company may not provide service unless tariffs are filed covering such service and the company may not deviate from the rates, classifications, regulations or practices contained in the tariffs so filed. 47 U.S.C.A. § 203(c).

The FCC has the power and duty to examine all tariffs filed and may either on complaint or on its own initiative determine and prescribe what charges, classifications, regulations, and practices are "just, fair, and reasonable" and are to be thereafter followed by the telephone company in question. 47 U.S.C.A. § 205 (a). The Commission is given extensive power to assess the value of the facilities of telephone companies. 47 U.S.C.A. § 213. The Commission has the power to order a telephone company to provide additional facilities for the performance of its duties as a public utility, if such addition is "in the interest of public convenience and necessity" or "the expense involved therein will not impair the ability of the carrier to perform its duty to the public." 47 U.S.C.A. § 214(d). However, a carrier does not have the right to extend its lines unless the Com-

has defined the particular regulatory policy in the particular case, the courts are not well equipped to make initial

decisions involving accommodation of the antitrust policy to the regulatory policy."

mission authorizes it to do so by the issuance of a certificate of public convenience and necessity. 47 U.S.C.A. § 214 (a). The Commission has power to examine transactions entered into by any common carrier which may affect the carrier's charges or services. 47 U.S.C.A. § 215(a). The Commission has the specific duty to keep informed as to "technical developments and improvements in wire and radio communication * * * to the end that the benefits of new inventions and developments may be made available to the people of the United States." 47 U.S.C.A. § 218.

Against this intricate statutory structure in which scarcely a single business act is free from continuous regulation or at least administrative governmental review, one thing emerges clearly. It is that Tariff No. 132, its meaning, its scope, its applicability, its validity for any or all governmental purposes, is ever-present. The best illustration is to accept momentarily the concession [14] of appellants that the tariff is authorita-

tively held to be valid administratively for regulatory purposes, to which they add, but not valid for antitrust purposes. We can recognize, of course, that in this sometime weird antitrust world, in which antitrust policies appear to have an overpowering influence in the running clash between supposedly coordinate executive agencies or departments of the same Government, cf. California v. FPC, 1962, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54, it is possible for the Courts to hold finally that this result could occur. But that choice ought not to be made, the occasion for facing such a possibility ought not to be forced until it is inescapably necessary. The very difficulties inherent in that prospect demonstrate that.

On any such hypothesis, of course, a significant thing will be the FCC determination of the validity of Tariff No. 132. If, as the law clearly permits,[15] the monopolistic and antitrust implications of the practices compelled by the tariff were among the factors considered and evaluated by the FCC, a Court would

14. Appellants do not make this as an *arguendo* assumption. On their thesis they accept it as valid for so-called "administrative" regulatory purposes.

15. Under statutory rate and practice standards of "just and reasonable," many technical and administrative factors are involved in the light of the industry being regulated. Some of the factors, many complex and highly technical, as we advance in the electronic age, concerning maintenance and upkeep of non-furnished equipment with resulting deterioration of high quality service for both incoming and outgoing calls, are illustrated in several cases. See, e. g., Peters Sunset Beach, Inc. v. Northwestern Bell Tel. Co., Minn. R.R. & Warehouse Comm'n, 1965, 60 P.U.R. 3d 363; City of Los Angeles v. Southern Cal. Tel. Co., Cal. R.R. Comm'n, 1933, 2 P.U.R. (NS) 247; In the Matter of AT&T & Western Union Tel. Co., F.C.C., 1948, Docket No. 8963. One of the factors, especially where, as here, the matter is precipitated by antitrust claims, is the propriety, if not the duty, of the administrative agency to consider monopolistic and antitrust implications. The Supreme Court has made this clear. In United States v. Radio Corp. of America, 1959, 358 U.S. 334, 348, 79 S.Ct. 457, 466, 3 L.Ed.2d 354, 364, the Court said:

"Accordingly, this Court consistently held that when rates and practices relating thereto were challenged under the antitrust laws, the agencies had primary jurisdiction to consider the reasonableness of such rates and practices in the light of the many relevant factors including alleged antitrust violations, for otherwise sporadic action by federal courts would disrupt an agency's delicate regulatory scheme, and would throw existing rate structures out of balance."
Even more pointed is the holding in McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 80, 64 S.Ct. 370, 377, 88 L.Ed. 544, 553, where the Court held:

"But in executing those policies [of the transportation Act committed directly to the ICC] the Commission may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot without more ignore the latter. The precise adjustments which it must make, however, will vary from instance to instance depending on the extent to which Congress indicates a desire to have those policies leavened or implemented in the enforcement of the various specific provisions of the legislation with

be hard put in either contriving or thereafter verbalizing a concept which, in a sort of now-you-see-it, now-you-don't sleight of hand, would allow the tariff to be valid and yet invalid at one and the same time.[16]

▮▮▮▮ Despite the disparagement of plaintiffs that the tariff is initially the handwork of the Telephone Companies' scriveners and is, at any event, not a rate but a mere equipment tariff, two things are positive. First, a tariff, required by law to be filed, is not a mere contract. It is the law. Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 696 & n. 12, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276; United States v. Associated Air Transp., Inc., 5 Cir., 1960, 275 F.2d 827, 833. Second, the telephone utility is required to file in its schedules and tariffs "the classifications, practices, and regulations affecting such charges," 47 U.S.C.A. § 203(a). The "classifications, practices, and regulations," as well as the charges, must be "just and reasonable." 47 U.S.C.A. § 201(b). The Commission is empowered to determine whether they are and its power extends to determining "what classification, regulation, or practice is or will be just, fair, and reasonable." 47 U.S.C.A. § 205(a). The "* * * Commission's range of power over the regulated companies" extends to " * * * 'charges, practices * *'" and "is not limited to rates and * * * services." Ambassador, Inc. v. United States, 1945, 325 U.S. 317, 323, 65 S.Ct. 1151, 1154, 89 L.Ed. 1637, 1642. Considering that so long as the tariff is "administratively" valid and applicable—as is assumed—the Telephone Company not only may, but must, enforce it uniformly as to all similarly situated, to permit the Antitrust Court to declare it invalid would be putting judicial imprimatur on operational chaos. It would require in effect that the Telephone Company disconnect service to those using Carterphones but who do not sue, while continuing service to those who sue. Worse, ratepayers, including those coerced under the operative effect of the tariff to discontinue Carterphone, would bear their proportionate part of the amount of triple damages and attorneys' fees paid out to the successful antitrust suing customer.[17] That chaos, of course, could be eliminated by the Antitrust Court holding that despite earlier FCC approval of the tariff, the monopolistic implications are so great that it cannot stand for any purpose. This, in effect, would be a first, second, or third tier re-review [18] of an already reviewed ad-

which the Commission is primarily and directly concerned."
See also FCC v. RCA Communications, Inc., 1953, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470; City of Pittsburgh v. FPC, 1956, 99 U.S.App.D.C. 113, 237 F.2d 741, 754.

16. Cf. Pan American World Airways v. United States, 1963, 371 U.S. 296, 309, 83 S.Ct. 476, 484, 9 L.Ed.2d 325, 335:
"It would be strange, indeed, if a division of territories or an allocation of routes which met the requirements of the 'public interest' as defined in § 2 were held to be antitrust violations. It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws."

17. See generally von Mehren, The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction, 67 Harv.L.Rev. 929 (1954), who concludes:
"The doctrine of primary jurisdiction is essential to effective regulation. Without it members of regulated industries would be subject to the commands of two masters—the regulatory statute as administered by the agency and the antitrust laws as administered by the courts. * * * It is nothing * more than a procedural device to secure preliminary administrative determinations of regulatory matters."
Id. at 965–66
* We would add this caveat: "Nothing" is a very very positive word, perhaps too much so.

18. First tier, the District Court trying the antitrust suit; second tier, the Court of Appeals reviewing that decision; third tier, the Supreme Court.

ministrative decision.[19] The likelihood of this occurring is remote enough to say that the prospect ought not to be anticipated.

There is, thus, the strong possibility that all, or a principal part, of the antitrust suit will effectually be determined by the resolution by the FCC of the validity and application of the tariff to Carterphone. This is not to say, as the appellants' briefs contend, that contrary to United States v. Radio Corp. of America, supra, 358 U.S. at 343–346, 79 S.Ct. at 463–465, 3 L.Ed.2d at 361–362; California v. FPC, supra; United States v. Philadelphia Nat'l Bank, 1963, 374 U.S. 321, at 350–354, 83 S.Ct. 1715 at 1734–1737, 10 L.Ed.2d 915 at 937–939; and Silver v. New York Stock Exchange, supra, the Communications Act of 1934 either confers immunity on telephone companies or commits to the FCC the determination of antitrust issues as such. What we do say is that inescapably presented is the question whether the practice permitted, indeed required, by Tariff No. 132 is lawful. If it is legal, and if it must be applied to all alike, then surely a significant issue having important, if not decisive, impact on the outcome of the antitrust litigation has been excised.

That this is a role of primary jurisdiction reference is demonstrated by assuming the success of the present appeal, our reversal of the stay pending reference and the immediate trial of the antitrust suit. Bypassing the difficult problems of what treatment, if any, the trial Judge would give to Tariff 132 either in the admission of evidence or jury instructions,[20] how would the validity and application of the tariff ever be effectively determined by the FCC with respect to this particular antitrust case and the assumed judgment for triple damages? In the face of the Seventh Amendment, could the District Court after jury trial and verdict then make a reference? Could the Court of Appeals? The Supreme Court?[21] If referred at that late stage what record would the FCC consider? The one hammered out under the narrow rules of episodic civil trial? A broad industrywide survey with full administrative exploration of the scientific and technical problems? Assuming the ultimate FCC determination thereafter of applicability and validity, how or in what manner could this be applied to penetrate the foggy mystery of the jury's general verdict? To these questions we do not even begin to suggest an answer. Nor do the plaintiffs. They simply ignore them on the simple, but natural, desire that, through the incantation of these magic antitrust epithets, these serious problems about Tariff No. 132 and its effective enforcement will somehow go away.

■ Embracing fully and enthusiastically the proposition that "no fixed formula exists for applying the doctrine

19. See note 12, supra.

20. In the District Judge's memorandum opinion, he stated:

"Determinations that regulatory tariffs are just, reasonable and valid permeate every aspect of telephone communications regulation. * * * The antitrust laws and the precise ingredients of this case are among the relevant factors for FCC consideration in determining the justness, reasonableness, validity, application and effect of the tariff and practices here involved."

This is not, as supposed from some of the Judge's comments during colloquy or as asserted in appellant's brief, to be read as a predetermination that the FCC either would or could or should evaluate this in the traditional antitrust Sherman Act "rule of reason" concept, see FCC v. RCA Communications, Inc., supra; McLean Trucking Co. v. United States, supra, or that the question of reasonableness is even open for inquiry in the per se case, see note 10, supra; *but see* note 11, supra. The regulatory statutory standard of "just and reasonable" reflects many factors, including antitrust implications. See note 15, supra.

21. Cf. Clay v. Sun Ins. Office, Ltd., 1960, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170, on certification upon remand, Fla., 1961, 133 So.2d 735, on receipt of answers to certification, 5 Cir., 1963, 319 F.2d 505, rev'd, 1964, 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229; Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1966, 358 F. 2d 347.

of primary jurisdiction" and that in "every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation," [22] this Court has given full voice to this device. And in nearly every instance where we order it, it ought first to have been ordered by the trial Court. Thus, contrary to the suggestion of appellants that as Judges we are in as good a position to read Tariff No. 132 as the FCC, we sent a tariff construction problem to the ICC in Louisville & N.R.R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887. There it was tariffese which created the problem. Here it is largely technological consideration as to the equipment, apparatus, etc., reasonably within the tariff's description. In River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, aff'd, 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, we ordered reference to the ICC of a serious problem of law under published tariffs. And in Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873, we sent to the ICC for initial determination the serious and far-reaching question of law concerning the interpretation and application of the Transportation Act and the interplay of the Agricultural Marketing Act, 12 U.S.C.A. § 1141 et seq.

The brief analysis which we have made demonstrates convincingly that the construction, application, and validity of Tariff No. 132 is a critical, if not decisive, issue. As in many other antitrust or similar cases, primary jurisdiction reference was imperatively called for.[23] Far East Conference v. United States, 1952, 342 U.S. 570, 72 S. Ct. 492, 96 L.Ed. 576; United States Nav. Co. v. Cunard S.S. Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408; Pan American World Airways, Inc. v. United States, 1963, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325; Carnation Co. v. Pacific Westbound Conference, 1966, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709, as amended, 383 U.S. 213, 86 S.Ct. 932, 15 L.Ed.2d 851. Although United States v. Radio Corp. of America, supra, stands for the proposition that there is no necessity to invoke the primary jurisdiction of the FCC in an antitrust suit challenging a television acquisition,[24] the Court, contrasting television with the "perva-

22. United States v. Western Pac. RR., 1956, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132.

23. Indeed, the Telephone Companies have referred us to at least four cases in which the precise relationship of the antitrust laws to the jurisdiction of the FCC has been considered by District Courts. Marcom, Inc. v. American Tel. & Tel. Co., No. 43215, N.D.Cal., July 28, 1965; Western States Tel. Co. v. American Tel. & Tel. Co., No. 64–175–PH, S.D.Cal., July 28, 1964; Secra-fone v. Illinois Bell Tel. Co., Civ.No. 60C–1022; N.D.Ill., 1961; Pastor v. American Tel. & Tel. Co., S.D.N.Y., 1940, 76 F.Supp. 781. In each case it was alleged that the actions of the defendant telephone companies, taken in accordance with their foreign attachment and interconnection tariffs, had prevented the plaintiffs from marketing their various devices designed for attachment to or interconnection with the channels of the defendants, and that such actions thus violated the antitrust laws. In each case it was held that primary jurisdiction lay in the FCC and appropriate state commissions.

24. Although this proposition is certainly laid down, it was unnecessary to the holding of the Court since the FCC had already approved the acquisition and there was nothing left for the Court but the task of accommodating the policies of the Commuuications Act to the aims of the antitrust laws. The Court indeed undertook this task, held that the approval of the FCC did not immunize the acquisition from the antitrust laws, and could have disposed of the case solely on this ground. See 3 Davis, Administrative Law § 19.06, at 16 (1965 Supp.). This is precisely what the Court did in United States v. Philadelphia Nat'l Bank, supra. Assuming, but expressly not deciding, 374 U.S. at 353 n. 32, 83 S.Ct. at 1736 n. 32, 10 L.Ed.2d at 939 n. 32, "the applicability of the doctrine [of primary jurisdiction] to merger-application proceedings before the banking agencies," the Court noted that "the present action would not be barred, for the agency proceeding was completed before the antitrust action was commenced," 374 U.S. at 353, 83 S.Ct. at 1736, 10 L.Ed.2d at 939, and disposed of

sive regulatory scheme" prescribed in the Communications Act for telephone and telegraph companies, fully recognized that where tariff structures might be thrown "out of balance" and "sporadic action by federal courts" might "work * * * mischief," 358 U.S. at 350, 79 S.Ct. at 467, 3 L.Ed.2d at 365, primary jurisdiction is available. So did the Court in Silver v. New York Stock Exchange, 1963, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389.[25] That the ultimate decision of the FCC may not be an end to the matter is neither unexpected nor decisive. For the doctrine applies "even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined." Far East Conference v. United States, 1952, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576, 582. Nor is it "even if the court thinks that the arrangement alleged to violate the antitrust laws cannot be legally approved by the agency" for "the court should still allow the agency first to pass upon the question." 3 Davis Administrative Law § 19.07, at 40 (1958). Nor is a reference a prejudgment that the regulatory act or agency offers antitrust immunity as such for "reference to an administrative agency is not restricted to situations when the agency has the power to immunize." [26] Maddock & Miller, Inc. v. United States Lines, 2 Cir., 1966, 365 F.2d 98.

In affirming this primary jurisdiction reference to the FCC,[27] we must sound to

the case on the ground that the Comptroller's approval of the bank merger did not immunize the transaction from the operation of the antitrust laws.

25. In *Silver*, the Court held that "the Commission's lack of jurisdiction over particular applications of exchange rules means that the question of antitrust exemption does not involve any problem of conflict or coextensiveness of coverage with the agency's regulatory power," and noted that "[t]his aspect of the statute * * * obviates any need to consider whether petitioners were required to resort to the Commission for relief before coming into court." 373 U.S. at 358 & n. 12, 360, 83 S.Ct. at 1247 & n. 12, 1258, 10 L.Ed.2d at 400 & n. 12, 402. Pursuing this further, the Court noted that "[t]here is nothing built into the regulatory scheme which performs the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition which cannot be justified as furthering legitimate self-regulative ends," and recognized in footnote 12 that "[s]hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." *Ibid.* Here, to the contrary, not only can the parties resort to the FCC for a determination of whether the "practice" of the telephone companies pursuant to Tariff No. 132 is "just and reasonable," 47 U.S.C.A. § 205, with a right to have this determination reviewed in the appropriate Court of Appeals, see note 12, supra, but that determination must certainly include consideration of antitrust policies, see note 15, supra. These differences from the SEC scheme there in issue require that the Antitrust Court not decide this question until the FCC's determination makes it necessary, and then with the guidance of the FCC's resolution of the technical problem involved.

26. Contrary to appellants' contention, the trial Judge did not directly or impliedly pass on the question of immunity. This and all other questions were deferred pending reference to the FCC.

27. While the effect of the order of reference is to impose on the appellants the burden of filing a complaint with the Commission, 47 U.S.C.A. § 208; 47 CFR §§ 1.701–735, the obligation to institute and prosecute such reference in good faith rests equally on the Telephone Companies as a condition to the continuation of the stay order. The Commission can on its own initiative order an investigation on whether a particular practice is "just and reasonable" and thereupon issue a cease and desist order, 47 U.S.C.A. § 205(a). More significant it may, in accordance with § 5(d) of the APA, 5 U.S.C.A. § 1004(d), "on motion or its own motion issue a declaratory ruling terminating a controversy or removing uncertainty." 47 CFR § 1.2. We again emphasize that nothing we have said here is intended to limit the manner in which the referred question (and all matters related thereto) are to be presented to the Commission, blueprint the type of proceeding to be followed by the Commission, limit the scope of the Commission's inquiry, delineate the factors to be considered by

all hands this caveat. In analyzing the contentions pro and con in the quest for seeking and identifying critical issues for initial administrative determination, nothing we have said or left unsaid, nothing expressed or implied, is to be considered as even a remote possible whisper of a suggestion as to how any one or more or all of the issues now disclosed or hereafter revealed are ultimately to be decided. All of those decisions are to be made first by the trial Judge when and after the primary jurisdiction reference has been concluded.

Affirmed.

the Commission, or indicate the conclusion to be reached by either the Commission or the District Court after the former has acted.