**INTERNATIONAL PAPER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 71–3531.

United States Court of Appeals,
Fifth Circuit.

Feb. 7, 1973.

Jerome Ackerman, James R. McCotter and John W. Douglas, Washington, D. C., for petitioner.

Gordon Gooch, Gen. Counsel, F. P. C., and George W. McHenry, Jr., First Asst. Sol., Washington, D. C., for respondent.

J. Evans Attwell and Jack D. Head, Houston, Tex., for Tex. East. Transmission Corp.

Dan A. Bruce, Houston, Tex., for Shell Oil.

William B. Cassin, Houston, Tex., for United Gas Pipeline.

Leon M. Payne, Houston, Tex., and W. Devier Pierson, Washington, D. C., for United Gas, Inc.

Thomas M. Knebel, Washington, D. C., for Willmut Gas & Oil Co.

Eaton A. Lang, Jr., Gulfport, Miss., and A. Edward Grashof, New York City, for Miss. Power Co.

Wm. W. Bedwell and John J. Mullally, Washington, D. C., for Miss. River Transmission Corp.

Harry L. Albrecht, Birmingham, Ala., for Southern Natural Gas Co.

Christopher T. Boland, Washington, D. C., and Robert O. Koch, Owensboro, Ky., for Tex. Gas Transmission.

Peter H. Schiff, Gen. Counsel, P. S. C. for N. Y., Albany, N. Y., and Richard A. Solomon, Washington, D. C., for Public Service Comm. for State of N. Y.

Howard E. Wahrenbrock, Washington, D. C., and John M. Kuykendall, Jr., Jackson, Miss., for Miss. Valley Gas Co., and others.

Clarence H. Ross and Raymond J. Petersen, Chicago, Ill., for Nat. Gas Pipeline.

Arnold D. Berkeley, Washington, D. C., and Fred G. Benton, Sr., Baton Rouge, La., for State of Louisiana, and others.

Barbara M. Gunther, Brooklyn, N. Y., for Brooklyn Union Gas.

Richard W. Duesenberg and Dwight W. Miller, St. Louis, Mo., for Monsanto Co.

John T. Miller, Jr., Washington, D. C., for Monsanto Co. and Texas Gulf Sulphur.

George W. Hugo, Houston, Tex., for Texas Gulf Sulphur.

John S. Schmid, New York City, for Boston Gas Co., and others.

Thomas G. Johnson, William G. Riddoch and Dan A. Bruce, Houston, Tex., for Shell Oil Co.

Before JOHN R. BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This case is one of a group arising from the adoption by the Federal Power Commission of "curtailment plans" filed by United Gas Pipe Line Company. These curtailment plans were the outgrowth of an order promulgated by the FPC and were aimed at serving the public interest by establishing a rational scheme of allocation of available natural gas in light of the current, somewhat critical, shortage of this much-used fuel. Due to this shortage, pipeline companies found that they would not be able to meet all of their current contractual obligations for delivery of gas. At present, the FPC has not finally approved any of the curtailment plans in question. It has, however, issued two orders, Opinions 606 and 606A, which are reviewable and are now challenged by numerous parties on several grounds before this court. Each of the contentions raised by this petitioner will be considered separately below.

FPC Jurisdiction to Enter Curtailment Orders Affecting Direct Sale Customers

At the time this action was initially briefed with this court, we had previously held in Louisiana Power & Light Company v. United Gas Pipe Line Company, 5 Cir. 1972, 456 F.2d 326, that the Commission did not have authority under the Natural Gas Act to order curtailment of sales to direct sale customers. In Federal Power Commission v. Louisiana Power & Light Company, 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L. Ed.2d 369, the United States Supreme Court reversed that determination by this circuit and held that the Commission was authorized to entertain curtailment plans with regard to both direct

sales and sales for resale. In this appeal International Paper does not challenge FPC jurisdiction over direct sales but limits its challenge only to certain language contained in Opinions 606 and 606A which relate to possible liability of a pipeline for contractual damages growing out of curtailment.

### Private Suits for Damages Growing out of FPC Approved Curtailments

Compliance with an FPC curtailment order, when and if such an order is ultimately adopted will mean that a pipeline cannot deliver to each customer all of the gas it has contracted to deliver. This, of course, follows from curtailment since curtailment is itself only a response to a shortage of gas. An issue of major concern is whether or not an FPC curtailment order alone will serve to insulate a pipeline unable to meet contractual commitments from liability for this failure. This issue may arise in two closely related legal actions: first, a customer may simply bring an action in contract for breach, and secondly, some of United's contracts contain "substitute fuel clauses" [1] which may also serve as a basis for breach of contract suits.

1. A "substitute fuel clause" is an agreement in the contract whereby the pipeline agrees to reimburse the customer for any premium which the customer must pay to obtain another fuel during periods which the gas supply is interrupted.

These substitute fuel clauses differ in form from contract to contract and their exact application to these curtailment situations is in dispute.

The clause in the International Paper-United Gas Pipeline contract is reproduced below:

*Excerpt From July 21, 1955 Contract Between United Gas Pipe Line Company And International Paper Company (Mobile Mill), As Amended*

XVII.

USE OF SUBSTITUTE FUEL

It is recognized by Buyer that in the pipe line operations of Seller it is desirable to relieve as far as possible conditions which cause excessive or peak demands of gas, and it is recognized by Seller that in the plant operations of Buyer it is desirable to eliminate any shut-downs caused by failure of the gas supply from whatsoever cause. Accordingly, in order to enable both Seller and Buyer to eliminate the above-described conditions, it is agreed that Buyer shall furnish or cause to be furnished at Buyer's sole cost and expense proper and adequate facilities (including oil storage tanks, fuel lines, oil meters and oil burning equipment) necessary to enable Buyer to use Bunker "C" grade fuel oil, to be purchased and supplied by Buyer, in lieu of gas for Buyer's fuel requirements, up to the Maximum Delivery Obligation then in effect, under the conditions hereinafter set forth; and that payments with reference to such fuel oil so used by Buyer shall be made between the parties hereto as hereinafter specifically provided. All fuel oil so used by Buyer for its fuel requirements shall be accurately metered by Buyer as it is used.

If so requested by Seller at any time and from time to time, Buyer agrees that it will use Bunker "C" grade fuel oil purchased and supplied by Buyer, as above set forth, in lieu of gas for Buyer's fuel requirements hereunder during the period or periods of time so requested by Seller. In the event Seller is excused by reason of force majeure or proration of impaired deliveries from delivering gas to Buyer for Buyer's fuel requirements hereunder, up to the Maximum Daily Delivery Obligation then in effect, and Buyer uses Bunker "C" grade fuel oil for its fuel requirements, even though not so requested to do by Seller, during the period Seller is so excused from delivering gas hereunder, all such fuel oil so used by Buyer during any period of not more than seven consecutive days shall be deemed to have been used by Buyer at Seller's request.

Payments with reference to fuel oil which is used by Buyer for its fuel requirements at Seller's request, up to the Maximum Daily Delivery Obligation then in effect, as provided in the next preceding paragraph, shall be made between the parties as hereinafter set forth.

On or before the fifth day of the month following any month hereunder during which Buyer used fuel oil for which payments are to be made between the parties as above provided, Buyer shall furnish to Seller a statement, together with supporting computations, calculations and determinations, showing:

(a) The number of barrels of fuel oil used by Buyer on each day during the

The FPC has attempted to address this issue in Opinions 606 and 606A. International Paper, and other petitioners in the related cases decided today, object to the result the FPC reaches on these matters.

When United first presented its proposed curtailment plan to the Federal Power Commission, section 12.3 of the proposed tariff included the language:

. . . nor shall Seller [United] be obligated to pay or credit such customers any sums with respect to substitute fuels burned by such customers during such a period of proration or interruption.

Instead of acting directly on this proposed section, the FPC made the following rather enigmatic statement in its Opinion 606:

We decline to render a declaratory order in Docket No. RP71–99, and so dismiss United's petition, because it

requests an interpretation of contract terms unnecessary in light of our action herein exercising jurisdiction over curtailment plans.

Implementation of the curtailment plan itself, pursuant to our procedures, would be an absolute defense for United against all claims for specific performance, damages, or other requests for relief under these contracts affected by curtailments that may be initiated in the courts. No additional tariff language like that proposed in Section 12.3 on Original Sheet No. 72–A is necessary to limit liability under contracts when agencies' orders, rules, or regulations authorize actions contrary to those contracts.

The customers of United, while agreeing to the deletion of section 12.3 from the proposed curtailment plan, strenuously objected to this additional lan-

preceding billing month for its fuel requirements in lieu of the quantities of gas which Seller failed to deliver on each day during such month up to but not in excess of the Maximum Daily Delivery Obligation in effect hereunder on each such day.

(b) The weighted average (expressed in cents per barrel) of the purchase prices, per barrel, f. o. b. Buyer's plant, paid by Buyer for all quantities of fuel oil in Buyer's storage facilities during the preceding month; such weighted average price shall not include any storage and handling costs and expenses for such fuel oil at Buyer's plant, and shall not take into consideration any volumetric losses or gains resulting from the storage and handling of such fuel oil.

(c) The amount of money due Buyer by Seller for such fuel oil so used by Buyer for its fuel requirements hereunder during such preceding month, which amount shall be determined by multiplying the number of barrels of fuel oil so used by Buyer during such preceding month as provided for in sub-paragraph (a) above, by the weighted average purchase price per barrel of the fuel oil in Buyer's storage facilities during such preceding month as provided for in subparagraph (b) above.

Upon receipt of each such statement from Buyer, Seller shall determine the gas equivalent of such fuel oil so used by Buyer for its fuel requirements hereunder during such preceding month; such determination to be made on the basis of one barrel of Bunker "C" grade fuel oil being the equivalent of 6,000 cubic feet of gas. The total quantity of such gas equivalent, so determined, shall be added to the total quantity of gas actually delivered by Seller to Buyer hereunder during such preceding month in order to arrive at the Monthly Rate per Mcf to be paid by Buyer to Seller for such gas equivalent during the month in question. Such monthly rate per Mcf, so arrived at, shall be multiplied by the total quantity of such gas equivalent, so determined for the month in question as above provided, and the result of such multiplication, without any adjustment thereof for Btu, shall be the amount of money due Seller by Buyer for such gas equivalent during the month in question.

Proper adjustments shall be made on the bill to be rendered by Seller to Buyer for gas delivered by Seller to Buyer during the preceding month, to give effect to the amount of money due Buyer by Seller as above provided, for fuel oil so used by Buyer during such preceding month, and to the amount of money due Seller by Buyer, as above provided, for the gas equivalent of such fuel oil.

guage inserted into the opinion by the FPC. Subsequently the FPC issued opinion 606A in which it sought to clarify the above language from Opinion 606:

> In clarification, this Commission has the responsibility and the authority to protect all consumers from efforts by pipelines to grant preferences in service to particular customers or classes of customers in times when gas shortage precludes fulfillment of all contracts for delivery of gas. A claim of preference in service directly or, in the case of substitute fuel clauses, indirectly, cannot operate to deprive this Commission of authority to assure fair and equitable curtailment plans. The pipeline companies cannot be faced with the dilemma of providing nondiscriminatory service as ordered by the Commission and at the same time incur liability for breach of contracts which grant discriminatory preferences, directly or indirectly. Thus, the Commission's authority to preclude undue preferences and discriminations in service operates to preempt any contract provisions inconsistent with the exercise of that authority as not being in the public interest.

Both on brief and at oral argument, the FPC maintained that no final action had yet been taken on either suits for damages or substitute fuel clauses because there has been no final adoption of United's curtailment plan.[2] It also appears to be the position of the Commission that mere adoption of a curtailment plan, *without specific reference to either damage suits or substitute fuel clauses*, will be an absolute defense to damage actions. If that is indeed the position of the FPC, we do not agree. We have decided that it would be helpful to all concerned for this court to attempt to set out its understanding of the FPC's position and its opinion on that position.

■ This court has been faced with the difficult task of determining just what was intended by the above language in Opinions 606 and 606A. After due study, we have determined that this language is mere dicta and has no force other than to reflect a position taken by the FPC which lacks support in the record before it. We undertake to give lengthy comment on this language so that no court in the future will be misled as to the import of this language because it was in an order upheld by this circuit. We also feel that by commenting on this language at this time we will give the FPC opportunity to further act on the matter if it so desires.

■ It seems to this court that the FPC is trying to use either of two general lines of argument to support its claim that mere adoption of a curtailment order alone, *without more*, will serve as an absolute defense to private contract actions. The first approach is gleaned from the language of the FPC in Opinion 606. That opinion seems to suggest that the FPC takes the position that its curtailment order alone will in all cases justify an absolute defense based on the contract theory of "impossibility of performance due to intervening governmental order." We note that in the very curtailment cases relied on by the FPC for establishing this "rule of law" the governmental entity which decided the effect of the FPC order on the private contract action was not the FPC itself but rather the court in which the private action was brought.[3] We feel that this is the proper way for deciding the effect of the FPC order

---

2. At present, part of this proceeding has been remanded by the Commission to the administrative law judge for further hearings. These hearings are directed specifically, as we understand it, to the question of any bad faith by United in contracting for gas which it knew might not be available, relying on curtailment as an "out" if enough gas was indeed not available.

3. Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784; Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 6 Cir., 1949, 177 F.2d 942.

where the only claim is a defense of impossibility due to the action of the FPC. We feel that a court which has the actual damage suit before it, and also the final FPC action, is best suited to determine the applicability of a defense recognized in contract law.[4]

As petitioner urges, there may be many reasons why a perfectly legal curtailment plan would not *per se* require that suits for damages would not also lie. First, it seems clear to this court that one major purpose of a curtailment plan is to allocate the available gas to prevent the richest and most powerful users from obtaining their full demand at the expense of the individual consumer.[5] This view would take the position that the FPC has only acted to allocate what was available, not to say that damages could not follow for the failure to foresee that contract demands could not be met, especially if a customer could show that the selling party intentionally entered contracts which he knew that he might not be able to fulfill. On this point we fully agree with the language of the District of Columbia Circuit in Monsanto Company v. Federal Power Commission, 1972, 149 U.S.App. D.C. 396, 463 F.2d 799, 808:

> The propriety of this course is fortified, for the case at bar, by the consideration that even assuming the FPC's curtailment jurisdiction is upheld, along the lines developed in its Opinion No. 606, it does not automatically follow that plaintiffs are lacking a contract remedy in damages. It is

possible that the FPC may be held to have jurisdiction under § 4(b), to prohibit unreasonable preferences in transportation, without relieving the pipeline company of liability for damages. That is to say, the industrial user may be able to say: Given the pickle created by the pipeline company, what the FPC did was lawful and proper as to actual subsequent rationing of the limited supply of gas, but the pipeline company is liable in damages because of the way it put us all in the pickle. And in the case at bar, there is a claim for damages sustained before the FPC issued an order. We do not decide this question, but only identify the problem. Certainly the problem is one that requires attentive consideration.

We too, like that circuit, do not seek at this time to resolve this issue, only to point it out. We do feel, however, that unless the FPC undertakes to directly speak on this matter, the proper forum for resolution will be in the court in which the issue is directly presented in the context of an actual controversy.

There are several other reasons why a court might find that the contract law defense of impossibility due to governmental action might be inapplicable. The case of substitute fuel clauses is illustrative for in such a situation the proof might show that the clause was entered into, for valuable consideration, with an eye on the very FPC ordered curtailment which may occur in this

---

4. We wish to point out that this part of our opinion is predicated on the assumption that the FPC was trying to say that mere adoption of a curtailment plan, without reference in the plan to damage suits, would give rise to an impossibility defense. In the next part of this opinion we discuss in more detail the claim that the FPC seems to rely on in Opinion 606A—that the mere adoption of a curtailment plan by the FPC will automatically be an exercise by the FPC to prevent "undue preferences" thus foreclosing damage actions.

5. For the protection of the public interest, it is quite logical to say that an administrative agency can determine where the available gas should go. It seems to us that it does not automatically follow that a determination that it is in the public interest for Y, a hospital, not X, a factory producing expensive jewelry, to receive the gas that X is foreclosed from going against the supplier for shortsightedness or overreaching in entering contracts for gas which he was ultimately unable to supply.

case.[6]   As previously noted, we enter this lengthy discussion only to prevent some future court from feeling foreclosed at the outset from entertaining an action for contract damages merely because of this dicta in Opinion 606 and do not in any way pass on the validity of any arguments for applying or not applying an "impossibility" defense.

■■   Courts do not and should not blindly dismiss actions on the ground of impossibility due to governmental action.   The order must itself be proper and must be addressed to the same considerations which are applicable to the suit for contract breach.   If the FPC seeks to convince a court that its curtailment order insulates pipelines from damage suits, it would seem necessary for the agency to present its reasons therefor, and not leave a future court to speculate as to whether an order indeed reached a pending suit.

In Opinion 606A the FPC, possibly recognizing the weakness of the position taken in Opinion 606, presented a different reason for supporting its language that the adoption of a curtailment plan would be an absolute defense to a suit for damages.

In 606A the FPC seems to first suggest that it has the power to abrogate any clause in a contract involving the transportation of natural gas within its jurisdiction and, secondly, that this is indeed the determination that it will be making by the mere adoption of a curtailment plan without direct mention of such clauses.  While this justification would at first seem directed primarily to substitute fuel clauses, it could also be applied to ordinary contract breach actions since the pipeline could take the position that curtailment had modified the amounts due for delivery under the contract and thus all amounts due were being  delivered.

The FPC bases its contention that it has the power to abrogate any contract

clause on the following statements of the Supreme Court:

\*   \*   \*   denying to natural gas companies  the  power  unilaterally  to change their contracts in no way impairs  the  regulatory  powers  of  the Commission,  for  the  contracts  remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest.   The Act thus affords a reasonable  accommodation  between  the conflicting interests of contract stability on the one hand and public regulation on the other.   United Gas Pipeline Co. v. Mobile Gas Service Corp., 350 U.S. 332, 344, 76 S.Ct. 373, 381, 100 L.Ed. 373 (1956).

\*   \*   \*   \*   \*   \*

Although the Natural Gas Act is premised upon a continuing system of private  contracting,  United  Gas Pipe Line Co. v. Mobile Gas Service Corp., supra, the Commission has plenary authority to limit or to proscribe contractual arrangements that contravene  the  relevant  public  interests. Permian Basin Area Rate Cases, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L. Ed.2d 312 (1968).

While this language on its face seems to clearly place such a power in the FPC to void contract clauses, several petitioners, like International Paper, argue that such language was never intended to apply to the curtailment situation now before this court.   For reasons subsequently made clear, we do not find it necessary at this time to decide the scope of the FPC's claimed power to void contract clauses.

■   Assuming  the  FPC's  claim  of power to abrogate these clauses, based on the Supreme Court cases above, is sufficient, there still must be, as clearly pointed out by the Supreme Court, a showing that the FPC has made a determination that the contract terms to be abrogated are "not in the public inter-

---

6.   As we understand it, the FPC has not undertaken to directly consider any specific "substitute fuel clause" or the bar- gaining history which led to its inclusion in the contract.

est" and that the FPC's abrogation is within the power it is granted by the Natural Gas Act.

The FPC has attempted in Opinion 606A to justify its power to invalidate these substitute fuel clauses under section 4(b) of the Natural Gas Act which prohibits "undue preferences."[7] The following language in Opinion 606A places the jurisdiction squarely on that ground:

> Thus, the Commission's authority to preclude undue preferences and discriminations in service operates to preempt any contract provisions inconsistent with the exercise of that authority as not being in the public interest.

If the FPC is indeed seeking to void these contract terms "in the public interest" under the "undue preference" section, we feel that it has failed to accomplish this purpose through Opinions 606 and 606A. At the outset, this court wonders why if the FPC felt it was indeed exercising a power within the discretion given it by Congress, it undertook to so exercise the power in such a circuitous fashion. It would seem that the straight forward adoption of United's proposed section 12.3 would be far preferable to the method used here by the FPC.

■ That question aside, it is incumbent on an administrative agency to supply clear findings and reasons supporting the findings whenever it seeks to exercise its power. Meaningful review cannot otherwise be obtained. These axioms are deeply rooted in American administrative process and need no citation. Opinions 606 and 606A do not adequately identify the existence of the power exercised or the reasonableness of the attempted exercise.

■ It must be recognized that there are two quite difficult determinations that the FPC must take before it can abrogate terms in private contracts even accepting the most favorable reading that the claimed power can be given. First, we feel it is incumbent on the agency to give clear reasons why it has determined that these substitute fuel clauses are indeed "undue preferences" within the meaning of that term in the Natural Gas Act. We would like to emphasize the word "undue" for it indicates to us that Congress may not have intended to void every item which could be termed a "preference", especially if it existed in a contract which was the result of legitimate bargaining. As we understand it, the FPC has never considered these substitute fuel clauses individually or looked into the bargaining behind their inclusion in the contract. Under such circumstances, we find it hard to see how the FPC could have found them "undue preferences." The bare conclusory statements in Opinion 606A are of no help in discerning the Commission's rationale.

Secondly, we feel that the FPC must make findings and set forth its reasons for holding that abrogation of these clauses is "in the public interest." The FPC must show that the recognized public interests in freedom to contract and contract stability are outweighed by the public interest it seeks to assert under the Natural Gas Act. Such considerations may indeed be present in this case but it is obvious to us that the FPC has not undertaken to state them for the record. The brief, unsupported conclusions in Opinion 606A are clearly not sufficient to meet the requirements for proper administrative action. Again, allocation by curtailment may be "in the public interest" but it does not necessarily follow that insulation from dam-

---

7. Sec. 4.(b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

ages is so justified. The latter question is the crux of the matter here.

Therefore, if the FPC is seeking to abrogate these substitute fuel clauses on this justification, we will not allow it to do so without more than the bare conclusions of Opinion 606A. As previously noted, we are at a loss to understand why the FPC was so reluctant to adopt a provision like proposed section 12.3 if that is indeed the result it wanted to reach and if it really felt that it had the power to adopt such a tariff provision.

Again, with regard to the argument in damage suits that the contract is being fulfilled since the Commission changed the requirements, there is a gap in reasoning to say that finding curtailment to be in the public interest means damages should not be available. If the FPC has reasons to support a contention that the right to sue for *damages* is voidable by the Commission as against the public interest, it must address the issue of *"damages* in the public interest", not *"curtailment* in the public interest."

■ Therefore, we feel that we cannot sanction those parts of Opinion 606 and Opinion 606A which indicate that the mere adoption of a curtailment plan, without more, will serve as an absolute defense to an action for damages, whether or not based on a substitute fuel clause. When and if the FPC presents a clear determination, directly citing reasons for both its power to act and the result which it reaches, based on some adequate record, then an appellate court can properly review both the agency's power to do what it has done and, within the well-established limits of judicial review of administrative action, the validity of the result based on the record before the agency.

We fully recognize the length of time which has already passed in these proceedings and regret having to return part of this matter to the FPC. We refuse, however, to pass on this issue until the FPC makes clear where it draws its justification for its order and presents a full opinion and record which can serve as the basis for meaningful review.[8]

Affirmed in part and remanded in part.

JOHN R. BROWN, Chief Judge (concurring):

I concur in the result and much of the opinion of the court. Believing that much of the court's *dicta*torial commentary might be misunderstood either by the parties or the ubiquitous courts who might fall heir to these unknown damage claims, however, I think some clarification is in order.[1]

I.

In Opinions 606 and 606A the Commission has spoken, rather cryptically, to the issue of whether compliance with an FPC sanctioned curtailment tariff would, should, or could exculpate a pipeline from its contractual duties to pro-

---

8. This position of the court does not seem greatly at variance with that of the FPC. Repeatedly at oral argument counsel for the Commission argued that no final determination on the damage issue had been made. The court was troubled, however, by the further assertion, which we detected in the Commission's opinions, briefs, and argument, that once any curtailment plan was adopted, without specific findings directly aimed at the damage issue, no damage action of any type could lie. We have undertaken in this opinion to set out the reasons we feel such a position is invalid with the hope that time and energy will be conserved by addressing the noted deficiencies before any final order is entered.

1. The principles announced by the court in this principal case today are applicable to a series of connected cases. See Mississippi Power & Light Co. v. FPC, (No. 72–1003) 476 F.2d 136; Gulf States Utilities Co. v. FPC, (No. 71–3627) 476 F.2d 135; Louisiana Power & Light Co. v. FPC, (No. 71–3429) 476 F.2d 132; State of Louisiana v. FPC, (No. 72–1220) 476 F.2d 140; Mississippi Valley Gas Co. v. FPC, (No. 72–1157) 476 F.2d 137. Likewise, my comments apply to those cases.

vide specified quantities of gas or pay for the substitute fuel used by its customers in lieu thereof. Curiously, the court suggests that the only forum invested with the power to make such a determination would be a court of law in which a damage suit was pending.[2] But this is surely not what we mean to say, for it would necessarily overrule many of our prior cases in which we have held that the administrative agencies of our government—indeed, the FPC in particular—have not only a right, but a positive duty to determine the legal and practical ramifications of their valid orders. See, e. g., J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84.

Perhaps the court creates this difficulty by failing to recall that the agency determination is subject to judicial review. We do not accord administrative agencies plenary jurisdiction, only primary.[3] Thus, although the court is correct in requiring additional rulings from the FPC, it should be emphasized that the ultimate contentions of the respective parties will be subjected to judicial scrutiny. Yet, in the interim, we must require full consideration by the FPC.

That the Commission may—indeed must—determine significant, sometimes decisive, questions of law is demonstrated by the Supreme Court's action in FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L. Ed.2d 369, noted by the majority in Louisiana Power & Light Co. v. FPC, (No. 71-3429) 476 F.2d 132, that it is incumbent upon the FPC to decide at the threshold whether it has jurisdiction, and if so, to what extent it will be exercised. It is a mistake then for anyone to read our opinions of this date as denying the FPC the power to pass on questions of law. And a question of law might well be whether a pipeline-seller may be held liable for damages.

II.

The Supreme Court has made it manifestly clear that the FPC must exert its controls under the Natural Gas Act over the allocation of our nation's mineral resources—curtailing service to industrial customers if necessary in the public interest. FPC v. Louisiana Power & Light Co., supra. Having concluded that the current critical gas shortage warrants the imposition of curtailment tariffs, the Commission has issued Opinions 606 and 606A. Clearly they must

2. In the words of the court:
"We note that in the very curtailment cases relief on by the FPC for establishing this 'rule of law' the governmental entity which decided the effect of the FPC order on the private contract action was not the FPC itself but rather the court in which the private action was brought. We feel that this is the proper way for deciding the effect of the FPC order . . . . We feel that a court which has the actual damage suit before it, and also the final FPC action, is best suited to determine the applicability of a defense recognized in contract law."

3. The best illustration of the point is offered by the subsequent history of the Huber case itself. In Huber we vacated two judgments after jury trials awarding royalties on the basis of fair market value, rather than the ceiling prices fixed by

the FPC. We remanded with directions for the District Court to require the parties to seek a declaratory order from the FPC on the question of whether gas royalties were "sales of gas for resale in interstate commerce." The FPC answered the question affirmatively, thereby holding that the royalties were subject to FPC rate ceilings. Denman v. J. M. Huber Corp., 42 F.P.C. 164. On subsequent judicial review the D.C. Circuit found this to be an erroneous statement of the law. Mobil Oil Corp. v. FPC, 1972, 149 U.S. App.D.C. 310, 463 F.2d 256. Cert. denied, 1972, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676. But this in no way denigrates our holding in Huber or Weymouth. For by holding that a court must stay its hand until the administrative agency has had the opportunity to act, we do not suggest that a judicial determination is inappropriate, but merely that it should be postponed.

be observed. No injunctive relief would be appropriate. See Monsanto Co. v. FPC, 1972, 149 U.S.App.D.C. 396, 463 F.2d 799.

But the various petitioner-customers involved in these cases suggest that, even given the premise that the FPC may order curtailment in fact, that they are still entitled to redress in the form of damages for breach of contract. As the court has suggested, there are two possible theories upon which this liability could be predicated—(i) that the failure to deliver the contractually stated quantity of gas, FPC curtailment order notwithstanding, constitutes a breach of the contract, and (ii) that the distributor must, under the "substitute fuel clauses" [4] of some of the contracts, reimburse the customers for the additional expense incurred because of the necessity of resorting to alternative fuels and fuel-burning systems.

### The Contractual Quantity

The damage litigation of Customer versus Pipeline seeking damages for failure to deliver may arise in two entirely distinct factual patterns. First, there is the customer who complains of the curtailment, but who is unable to make any substantial allegations or proof that his service was reduced by anything other than a governmentally ordered curtailment resulting from an acute shortage of natural gas. Surely the pipeline must be exonerated completely in this instance.

But the basis of this exoneration is not, as the court suggests, the mere contractual defense of "impossibility of performance due to intervening governmental order." It is based upon the intrinsic power of the federal government to pre-empt and abrogate private agreements in the interest of the public weal. It is a question of supremacy.

This court, by decisions binding on this panel, has previously committed itself to the view that federal administrative regulation may often obliterate or extinguish claims for relief including damages normally available to an injured party. In Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486, 496, again requiring primary jurisdiction by reference to the FCC, we declared that a utility could not both be required to comply with a validly filed tariff and, at the same time, be liable for money damages based on monopolistic, anti-trust practices growing out of compliance with the tariffs prohibiting the attachment of "foreign" equipment. In the case sub judice, the curtailment order, if valid, constitutes an abrogation of any contractual provision calling for current delivery of specified quantities. It would be unthinking to suggest that, having curtailed in compliance with the dictates of the FPC, that the Pipeline could thereafter be held accountable for its compliance. See Carter, supra; PepsiCo, Inc. v. FTC, 2 Cir., 1972, 472 F.2d 179 [1972]. This would seriously impair the orderly administration of the regulatory scheme.

But there is a second factual pattern, best illustrated by the D.C. Circuit's opinion in Monsanto, supra. Several established, so-called "firm" customers of the various pipelines have asserted that the need for curtailment was precipitated by the pipeline's own failure to heed the signs of an impending crisis. These customers claim that, by taking on new obligations—knowing full well that its resources were limited—that the pipeline has created the "pickle", 463 F.2d at 808, and counted on the FPC to bail it out with a curtailment order. I readily agree with the court that, if a customer could prove this element of "bad faith" on the part of the pipeline, that the parameters of the analysis might—and the word is might—be vastly altered, and warrant the FPC [5] or the court entertaining the damage suit in concluding

---

4. See note 1 of the court's opinion.

5. Apparently the administrative law judge is now hearing evidence on this matter.

See the court's note 2, supra. Thus, we can expect some definitive statement from the Commission in review.

that the piper must pay the pipee. But, this too, would be subject to full considerations of the total *impact* [6] of the decision including the source from which allowable damages are to come.

### Substitute Fuel Clauses

Obviously, there is a significant difference between the quantitative contract clauses and the substitute fuel clauses, if, as the court suggests, the FPC seeks to justify the abrogation of these latter clauses under the "undue preference" section of the Act. But I agree with the Court that the record before us is not a sufficient indication that this is the basis for the Commission's order. Accordingly, I agree that we must remand the case to the FPC for further clarification. In so doing, however, I would hasten to suggest that there is a major factor as yet unconsidered by Commission or court which must be thrown into the scales in order to determine what impact the decision to allow a damage action might have on the fulfillment of the goals of the Act—the factor of who must ultimately pay the damages.

### III.

As long as we purport to comment on every issue which might be expected to emerge in connection with the curtailment order, I think that it would be appropriate for us to call attention to the factor of *who* must pay the judgment and, more significantly, from *what* funds. Assuming for the moment that the FPC and the reviewing court or damage suit court determine that it is appropriate to allow customers to recover damages in spite of the governmental sanction on the curtailment because of the Pipeline's bad faith or the interpretation of the substitute fuel clauses, into which pocket must the customer dip? It would be an obvious frustration of the orderly control by the FPC if the damages could be paid out of current revenues contributed by rate-payers at rates necessarily increased to

care for this exponential liability. Bad faith or not, the rate-payers of America are entitled to be free from this burden. Only if the damages can be assessed out of retained surpluses or assets not needed to meet customer demands, can they be collected. The test is one of impact, and the impact on the rate-paying public would be too great if it were any other way.

### IV.

The FPC is not a sterile body incapable of determining legal problems of the most far-reaching kind. Its authority to regulate is plenary and exclusive. It speaks through orders both negative and positive. And the law vests it with the power to determine whether its exclusive responsibility is to be thwarted or frustrated by any action, whether in the form of disobedience to a curtailment order, or by imposing on current rate-payers the burden of paying for the past sins of the pipeline.

In short, the apparent winners of this appeal have not gotten much.