513 F.2d 862
 Petition of Josette GEISSER, divorced Bauer, a/k/a Paulette
Louise Fallai, Petitioner-Appellee,
v.
UNITED STATES of America, Respondent-Appellant.
Josette Claire BAUER nee Geisser, Petitioner-Appellee,
v.
UNITED STATES of America, Respondent-Appellant.
 No. 73-3678.
 United States Court of Appeals,
Fifth Circuit.
 May 27, 1975.
 
 Lloyd G. Bates, Jr., Asst. U. S. Atty., Miami, Fla., Shirley Baccus-Lobel, Dept. of Justice, Crim. Div., Appellate Sec., Washington, D. C., for respondent-appellant.
 William C. Marchiondo, Albuquerque, N. M., for petitioner-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before BROWN, Chief Judge, and GODBOLD and RONEY, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 This is an extraordinary case calling for extraordinary action. It is a case of the great United States going back on its word in a plea bargain made by the Department of Justice which assured the Government vital indispensable evidence leading to conviction of principals in a grand scale international heroin importing conspiracy. The effect of part of the bargain was that the defendant-turned-states-evidence would not be deported to Switzerland or France. The other part was that under the sentence imposed she would not be confined for more than three years. Instead of doing either of these, there is an outstanding warrant and a certificate to the Secretary of State for her deportation to Switzerland on the diplomatic demand of the Swiss charge d'affairs and the Board of Paroles (Board) has declined to grant parole in terms which would honor the commitment.
 To this the Government speaking through its statutory advocate, 28 U.S.C.A. § 509 offers only the weak justification that notwithstanding breaches of constitutional dimension, there is nothing that can be done about it since (i) the Government by extradition treaty with Switzerland is bound to deport her on demand and (ii) granting release is an unwarranted intrusion into the discretion of the Board as an independent agency notwithstanding the fact that the Board is a subordinate element of the Department of Justice. 18 U.S.C.A. § 4201.
 The trouble with this is that in this highly legalistic appeal there is nothing to indicate that the State Department is aware of the bargain or that once informed of it and its breach, the Secretary of State would take the indispensable step which at one and the same time would accomplish deportation and violate the constitutional rights of the petitioner. Similarly, there is no record indication why the superiors in the Department of Justice did not make the proper representations to the Board to carry out the bargain or what the otherwise independent Board would have done had it been fully informed.
 
 
 1
 Because we are of the view that the judiciary should not be dragged into refereeing this intragovernmental squabble until it is certain that these constitutional problems cannot be avoided, we call on principles analogous to the doctrine of primary jurisdiction so that in a responsible, factual way the judiciary knows what the real score is. To this end we vacate the orders and remand for further proceedings, with the petitioner remaining free on terms pending final judicial resolution which hopefully will never have to take place.
 
 
 2
 Josette Claire Bauer is a Swiss national who has an uncompleted prison sentence outstanding against her in Switzerland for the murder of her father. She was arrested in Miami on August 31, 1967 when she and her accomplice, Willy Lambert, attempted to smuggle 28 lbs of heroin into the country aboard a ship.[1] The two "mules"[2] were suspected by Customs and the BNDD of being part of a large Corsican-French drug chain. This conspiracy was known to exist but up until this time the United States officials had been unable to find a link at which to break it.
 
 
 3
 In an effort to induce their cooperation, the Government investigators disclosed the full extent of the evidence against them to their attorney, James Jay Hogan, who had, incidentally, replaced their initial counsel both of whom had been indicted in the same conspiracy. Confronted with multiple counts and heavy mandatory sentences aggregating many years, Lambert and Bauer quickly reached a bargain with the Government. They agreed not merely to volunteer all their knowledge of the domestic and international drug conspiracy but affirmatively to testify against their superiors in the ring, should they be caught and brought to trial.
 
 
 4
 For its part, the Government agreed to reindict the two and allow them to plead guilty to a 2 count indictment that carried a combined maximum sentence of 7 years. Their confinement, however, would last only 3 years, after which time they would be paroled.
 
 
 5
 Lastly, but central to this case, at some point in the negotiations, when Mori the so-called "traffic manager" of the ring was finally caught and testifying against him was no longer a hypothetical possibility, Lambert and Bauer balked. They were obsessed by their intense fear of reprisals a fear all the agents concerned accepted as well-founded. As a consequence, the Government attorneys responsible for the prosecutions promised them that the Government would "use its best efforts to get them to a country other than Switzerland . . . "[3] They were, as a practical matter, protected against deportation to Switzerland.[4]
 
 
 6
 The full impact of both the value of their testimony and the extent of the Government's promises is conveyed in the exhibit letter of William Earle,[5] Special Attorney to the Department of Justice Organized Crime Section. The letter demonstrates that the assurances of the government were emphatic and without them the two would never have testified.
 
 
 7
 The ability of the Government to fulfill this last promise to Bauer is complicated by ancillary extradition proceedings brought against her by the Swiss Government before Judge Atkins in the Southern District of Florida under 18 U.S.C.A. § 3184. An order certifying to the Secretary of State the extraditability of Bauer was granted November 2, 1967 without Judge Atkins having any apparent awareness that Bauer was then or would shortly be involved in plea negotiations with the Government.[6] Whatever might have been the duty of the United States Attorneys to intercede in the extradition hearing, it is a certainty that the Government attorneys were entirely aware of the outstanding order at the time they bound the Government to "use its best efforts" to insure her deportation to a "safe" country.
 
 
 8
 Bauer and Lambert kept their bargain. They supplied information that in the words of William Earle, Special Attorney to the Department of Justice Organized Crime Section, was "the first crack in breaking down the entire international narcotics conspiracy." Judge Mehrtens, who presided at the conspiracy trial and later at the habeas hearing, recalled that Josette Bauer was the more valuable of the two witnesses at the Mori trial and that ". . . she was one of the most impressive witnesses I have ever seen in a lawsuit. The witness had a remarkably retentive memory as to dates, places and times . . . without Mrs. Bauer I am quite sure Willy (Lambert) would have been able to testify to only about one-tenth of what Mrs. Bauer testified to."
 
 
 9
 Mori was convicted and sentenced to 20 years in prison. Bauer and Lambert began to serve their own sentences on December 1, 1967, anticipating that the Government would keep its promises. But, as the two-year mark approached, they began to get overtures from Swiss and French investigators seeking information. Specifically, Josette Bauer was told by Customs Agent Alan Yarborough who conferred with her in prison that the Swiss Government wanted her badly enough that they were willing to send 2 agents here to talk to her. According to her testimony, Yarborough told her that the Government was not going to be able to keep its promise and prevent her deportation to Switzerland.[7] Highly agitated by these events, within the month she escaped on October 10, 1969 from her prison in Alderson, West Virginia. For two years she lived in Albuquerque, New Mexico.[8] She was captured on June 25, 1972 and on May 1, 1973 she was sentenced to serve 18 months for the escape to run consecutive to her remaining sentences. When she returned to prison, the Department of Justice expressly disavowed the agreement and on June 14, 1973 her application for parole was denied by the Board which directed that she serve out the remainder of her 7 year Miami narcotics sentence.
 
 
 10
 Meanwhile, Lambert remained in prison. As the three-year point approached, he and his counsel were surprised to discover that nothing had been done on his behalf by the Government to increase the likelihood of his parole. His counsel contacted the Assistant United States Attorneys and other government officials with whom he had negotiated the plea bargain and at their urgings the Department of Justice finally acted. In response to its recommendation, the Board granted the parole. Following his release, U.S. Marshals escorted Lambert to the airport where he bought a ticket with his own money to the Netherlands. Nevertheless, his hopes of safe passage to a sanctuary were unrealistic because his presence on the plane was somehow known to the Swiss. He was met at the Netherlands airport and immediately removed to Switzerland. At the time of Bauer's habeas hearing, Lambert's attorney in response to inquiries had heard no word from him for over a year.
 
 
 11
 Now Josette Bauer returns to court, hoping that her case will have a better outcome than that of her co-defendant. She seeks to compel the Government to live up to its plea bargain by specifically enforcing the plea agreement and enjoining the extradition order. She charged that the order amounted to an unlawful detainer by the Secretary of State because it violated the plea bargain and because the Swiss offense did not fall within the terms of the extradition treaty.
 
 
 12
 After an extensive hearing Judge Mehrtens found that there was a specific, definite agreement that she would not serve over 3 years and that she would be deported to some country other than Switzerland or France.[9] Bauer was discharged from any further detention imposed as a result of her Miami narcotics conviction[10] and the District Judge set aside and enjoined the execution of the extradition order. He directed that if it was determined that she should be deported, it would be only to an "acceptable" country not France, Switzerland or the possessions of either.
 
 
 13
 On appeal, the Government does not challenge the findings of fact of the District Court. It accepts these but objects instead to the method and timeliness of the District Court intervention in the case. The Government argues that (i) Bauer's habeas action is premature because the extradition order has not issued due to her incarceration for 5 more years on the two consecutive sentences, (ii) the judgment should be vacated for petitioner's failure to join the Confederation of Switzerland as an indispensable party under F.R.Civ.P. 19(a) because of its direct interest in the person of Josette Bauer; (iii) and the District Judge usurped the exclusive power and responsibility of the Board by releasing Bauer.
 
 
 14
 As we pointed out in the prologue, at the core of each of these arguments is the essential fact that the Government occupies a schizophrenic position. The Department of Justice, having made a bargain that it would do its best to influence the actions of the independent sister branches of the Government the State Department and the departmental subordinate, the Board and having convinced Josette Bauer that it would in all likelihood be successful, claims to find itself with contradictory commitments to Josette Bauer and the Swiss Government.
 
 
 15
 Assuming, as insisted upon by the Department of Justice, that the deportation-extradition commitment was not the absolute one found by the Court (see note 9, supra) but the more limited one to use its "best efforts", this record and the very fact of this appeal shows an outright failure to comply. The best effort would, at a minimum, be a strong presentation to the Department of State as to what had been promised and the likely dangers to the bargainee-defendant-witness. But the record is silent. All we have is the legalistic position voiced by the Department of Justice as the official spokesman that this has to occur under statutes and treaties.
 
 
 16
 But we are not at all sure that a Secretary of State who is instructed by the chief legal officer of the nation that failure to keep the bargain is a plain violation of Bauer's constitutional rights would persist in the steps to effectuate extradition.[11]
 
 
 17
 Similarly, the Department of Justice had the minimum duty of advising the Board of the trade and the importance to the public interest of its being honored. Yet the Department did not do that. To the contrary, it actively opposed the granting of parole which would effectuate the promise of a three-year confinement. We recognize that in a structure of independent quasi-adjudicative agencies within an Executive department there is and should be no hierarchical intrusion into the exercise of administrative discretion. At the same time, that agency needs to be advised in positive terms of the agreements made, the consequences of which were (i) rich in terms of the public interest and (ii) of constitutional consequences to the bargainee if not honored. But, as discussed, we are likewise in the dark. The Department of Justice which has at least some supervision over this agency tries to force us into deciding whether a Court can intrude before the Judiciary has reliable information that the Board would not correct its own errors once it is fairly advised.
 
 
 18
 What is needed in this international plot is an authoritative declaration of the position of the United States Government not just that of one or more departments or agencies.
 
 
 19
 ( 2) It is at this point we invoke principles akin to primary jurisdiction. This invaluable doctrine has evolved from what was originally a means of preventing courts from overriding agency jurisdiction[12] to become a means to flexibly harness the resources of agency or departmental expertise to the judicial decision-making process.[13] We have repeatedly benefited by the use of this mechanism.[14]
 
 
 20
 It has special usefulness in a case such as this where the District Court and this Court need to know just exactly what the Secretary of State proposes to do in the light of this confessed failure to keep the faith. Without this unified sovereign pronouncement, we strike out blindly to formulate a judicial remedy with unknown and weighty variables, not the least of which is treading upon delicate international relations.
 
 
 21
 Once the concept is properly understood, there is ample precedent for this demand for a governmental resolution of its total position. For example, in shipping cases,[15] the Supreme Court directed that the courts defer review until the Federal Maritime Board had the opportunity to consider the legal issues. In both Cunard and Far East the parties had generally complained that the actions of a conference of carriers in operating a dual system of shipping rates that benefited those shippers that contracted exclusively with the conference members violated the anti-trust laws. Subsequently in Isbrandtsen, the Court outlined the vital role of the administrative, executive determination:
 
 
 22
 It is, therefore, very clear that these cases, while holding that the Board had primary jurisdiction to hear the case in the first instance, did not signify that the statute left the Board free to approve or disapprove the agreements under attack. Rather, those cases recognized that in certain kinds of litigation practical considerations dictate a division of functions between court and agency under which the latter makes a preliminary, comprehensive investigation of all the facts, analyzes them, and applies to them the statutory scheme as it is construed. Compare Denver Union Stock Yard Co. v. Producers Livestock Marketing Assn., ante (356 U.S.) p. 282 (78 S.Ct. 738, 2 L.Ed.2d 771). It is recognized that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern. Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation.
 
 
 23
 Maritime Board v. Isbrandtsen Co., 1957, 356 U.S. 481, 498, 78 S.Ct. 851, 861, 2 L.Ed.2d 926.
 
 
 24
 What we are saying is that the United States Government must in the light of the commitment made by its prosecutorial arm look carefully at the constitutional obligations owing Bauer. When it looks whether through the advocative eyes of the Attorney General or through those of the Secretary of State, whose oath of office calls for support of the same constitution all will see Santobello[16] as a lion in the streets. There the Court reversed the conviction of a defendant who pleaded guilty after agreeing with one prosecutor that no sentence recommendation would be made only to have a new prosecutor recommend the maximum punishment at the time of sentence. Despite the fact that the sentencing Judge emphasized that, in view of the defendant's prior record, the absence of a recommendation by the prosecutor would have made no difference in the sentence, the Supreme Court found that the impact of such a breach justified reversal. In the words of the Chief Justice:
 
 
 25
 This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.
 
 
 26
 Santobello v. N. Y., supra at 262, 92 S.Ct. at 499. As a remedy, the case was returned to the state court for a determination of whether the appropriate remedy was specific performance of the promise before another Judge or an opportunity to withdraw the plea.[17]
 
 
 27
 Thus, following Santobello, defaulted plea bargains must be remedied. But the avenues of redress available for Bauer are few. Eradicating the impact of her testimony is impossible. And, of course, an opportunity to replead seems superficial and unrealistic in view of her long confinement. Specific performance may well be the only way out to keep the bargain.
 
 
 28
 Although it poses none of the delicate problems of international relations and the effectuation of treaties, Santobello stands for much more in assaying the failure of the Department of Justice to take honorable but effective action before the Board to secure her release at the end of the promised three years. The Government does not even begin to whisper the faintest suggestion of a possible reason why it did not in advance of the approaching three-year expiration make the appropriate representations to the Board.[18] All it can do is to faintly urge that the District Judge's action usurps the exclusive role and independence of the Board, citing: Tarlton v. Clark, 5 Cir., 1971, 441 F.2d 384; Buchanon v. Clark, 5 Cir., 1971, 446 F.2d 1379; Thompkins v. United States Board of Parole, 5 Cir., 1970, 427 F.2d 222; Simon v. United States (E.D.La., 1967), 269 F.Supp. 738, aff'd, 1968, 397 F.2d 813.
 
 
 29
 Sharing as we do the Government's concern about judicial intrusion into the parole process,[19] we defer until after remand whether we would put our stamp of approval on the District Judge's order which in effect releases Bauer at the end of the reconstructed three-year term.[20] We do this because remand offers an ample opportunity for the judiciary to be informed of exactly (i) what would have taken place by the Board had the Department of Justice kept its word, and (ii) what would now take place if, on a full disclosure of the positive commitment and the consequent violation of Bauer's constitutional rights, the matter would be resubmitted to the Board. Both the Board and its hierarchical superiors are to respond authoritatively on this.[21]
 
 
 30
 Several things are to be accomplished by and on the remand. The Government shall, after consideration of the promise made and the failure to keep all or part of it by the respective officials at the highest levels, state unequivocally the position of the United States Government. In the event that position does not result in the effectual release of Bauer from the restraints or prospects or threats thereof, the District Court shall conduct further hearings after allowing fullest discovery on all issues and particularly on the question of just what has been done with the promise "to use our best efforts" and the reasons why, if any, steps have not been taken or why they have been ineffectual.[22]
 
 
 31
 The Government asserts that, in any event, the case is not ripe since, if the prison term remains effective, the deportation cannot take place for several more years. We reject this for several reasons. To begin with it assumes that the order releasing her from further confinement will be reversed. But more basically, her very personal interests are so vitally affected that the situation of threatened return to prison and later extradition constitutes sufficient custody.[23] Undoubtedly, Josette Bauer is harmed if there is any likelihood that the Government will not stand by its promise irrespective of whether she is five minutes or four years from deportation.
 
 
 32
 This brings us to the contention that the case must be dismissed (or vacated and remanded) for failure to join the Confederation of Switzerland under F.R.Civ.P. 19(a)(2). Again there are several reasons why we reject this. At the outset this is raised for the first time on appeal[24] itself a factor which may be evaluated in considering joinder. Provident Bank & Trust v. Patterson, 1968, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed. 936.
 
 
 33
 Next, the Federal Rules have only limited application to habeas proceedings. In 1969, the Supreme Court considered the applicability of the Federal Rules to habeas proceedings in the context of discovery. Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (construing F.R.Civ.P. 81(a)(2) ). The Court referred to a "considerable debate " over the applicability of the joinder rules, and expressly "intimate(d) no view." 394 U.S. at 294 n. 5, 89 S.Ct. at 1088, 22 L.Ed.2d at 288.
 
 
 34
 The Court did, however, point out the remarkable expansion of the habeas remedy's scope since the institution of the Federal Rules in 1938, the critical date in using the "conformity" test. A great deal of that expansion has come in defining "custody." E. g., Peyton v. Rowe, 1968, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426; Jones v. Cunningham, 1963, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285. Even today, however, we have considerable doubt that concept has enlarged to the point Switzerland alone could be named as a habeas respondent in this situation. And the Government has especially failed to indicate any pre-1938 authority to the effect that one not physically a custodian of petitioner's body is a proper party-respondent.[25] We conclude that Rule 19 is not in "conformity" with pre-1938 practice and, therefore, not applicable in this case.
 
 
 35
 More important, under the solution we mandate there may not even be any judicial order required to carry out the bargain. If Switzerland feels aggrieved at such a possible executive-political resolution, its avenues of redress would more likely be through diplomatic means or in international tribunals.
 
 
 36
 Vacated and remanded.
 
 
 
 [1]
 The Special Attorney with the Department of Justice, Organized Crime Section, William G. Earle, testified that this was the largest heroin seizure ever made in the United States up until that time
 
 
 [2]
 Earle noted that the two were known as "mules" in drug patois because of their courier status
 
 
 [3]
 The two had some confidence that if the United States would supply them transportation incognito to a "safe" country, they could make it on their own
 
 
 [4]
 Indeed it cannot be better stated for Bauer than as done in the Government's brief:
 Thereafter, a bargain was consummated whereby Bauer and Lambert agreed (1) to provide the government with all the information they possessed concerning the international narcotics trade, (2) to provide any evidence they possessed with respect to their original attorneys Prebish and Pollack, and (3) to testify should the need arise. In return, the government agreed to dismiss the indictment against them, under which they faced the possibility of thirty to forty years' imprisonment. They were permitted to plead to a superceding two-count indictment charging conspiracy (18 U.S.C. (s) 371) and travel in foreign commerce to facilitate the unlawful importation of narcotics, in violation of 18 U.S.C. (s) 1952. Each was sentenced, pursuant to the parole eligibility provisions of 18 U.S.C. (s) 4208(a)(2), to 2 years' imprisonment on the conspiracy count and five years' on the § 1952 count, the sentences to run consecutively. It was further agreed that they would be released, pursuant to the Department of Justice's recommendation to the Board of Parole, after having served three years' imprisonment.
 While there is some confusion and conflict as to the other aspect of the bargain, it is at least clear that Bauer and Lambert, who greatly feared being returned to Switzerland due to anticipated reprisals for their cooperation with the United States government, were assured by a federal representative that the Department of Justice would use its best efforts to assure that neither was deported to Switzerland.
 Brief for the Appellant, United States Government, pp. 3 and 4.
 
 
 [5]
 
 February 15, 1973 Miami, Florida
 William C. Marchiondo, Esquire Marchiondo & Berry, P.A. Post Office Box 568 Albuquerque, New Mexico 87103
 Dear Mr. Marchiondo:
 The following is in response to your request for information:
 My name is William G. Earle, and I was a Special Attorney with the Department of Justice, Organized Crime Section from 1966 through late September, 1969. I was assigned primarily to Miami. In connection with my duties as a Department of Justice, Organized Crime Attorney, I worked closely with the United States Attorney's Office and was involved in all of their corruption and organized crime investigations, including major narcotics investigations. I worked with the United States Attorney's Office and was the Justice Department attorney responsible for the heroin smuggling cases involving Josette Bauer and Willy Charles Lambert. Josette Bauer and Willy Lambert were arrested on August 31, 1967, after bringing 14 kilos of heroin into Port Everglades, Ft. Lauderdale, Florida. At the time of their arrest, this was the largest, or one of the two or three largest heroin confiscations, or heroin seizures ever made in the United States. I was immediately notified by U.S. Customs Agents Alan Yarborough and George Corcoran, and was involved in the investigation from the outset. My reasons for being involved and our primary objectives in this investigation were twofold. Firstly, Josette Bauer and Willy Charles Lambert were only "mules" in the operation. They were just couriers, carrying the heroin into the United States. We wanted to get to the real supplier that were behind Bauer and Lambert. We wanted not only to secure convictions of the people that were immediately above Bauer and Lambert in the heroin organization, but to get as much information as we could about the French, Corsican and European heroin organizations. In 1967 there had not been the wave of major heroin smuggling cases that have since occurred. The knowledge of the French and Corsican organizations was very sketchy, and there certainly was no hard evidence that would lead to arrests, indictments or convictions of anybody outside the borders of the United States. This case, then, provided a potential breakthrough.
 Immediately then, we pursued an objective of attempting to get the cooperation of Bauer and Lambert in return for a lighter sentence than they would otherwise receive. They could have been sentenced to 40 years on substantive and conspiracy counts of smuggling heroin. After being represented briefly by Paul Pollack, Esq. and Harry Prebish, Esq., they retained attorney James Jay Hogan to represent them, and Mr. Hogan and I began a series of conversations. I outlined the ironclad case we had against Bauer and Lambert and attempted to convince Mr. Hogan to convince his clients that their best interests lay in cooperating with the United States Government. The Grand Jury returned an indictment on September 25, 1967, indicting Josette Bauer, Willy Charles Lambert and Robert Mori and charging them with substantive and conspiracy violations of 21 U.S.C. § 174. These counts carried minimum mandatory sentences of 5 years on each count. After lengthy negotiations with Mr. Hogan a deal was struck. The deal was that Bauer and Lambert would tell the United States Government all they knew about narcotics smuggling and the narcotics organization in Europe, mentioning names, places and dates: everything they knew. They would also tell us the entire situation concerning the relationship between them, the missing heroin, and their original attorneys, Paul Pollack and Harry Prebish; we would reindict them so that the maximum sentence would be 7 years, but, in any event, we would see to it that if they cooperated they would not serve more than 3 years. We also mentioned that if they cooperated, we would do everything possible to see that they would be deported to a country other than Switzerland. We did discuss specific countries, no guarantees were given, but at a later time I did discuss with Willy Lambert and Josette Bauer the possibility of their being deported to South America. Before making the deal with Hogan, we wanted some assurance that we were not buying a "pig in a poke." I asked Hogan to talk to Bauer and Lambert and to give me some idea of the information they had. He talked to them and told me the type of information they could give. I relayed this to Bill Lynch and Henry Petersen of the Justice Department in Washington and they agreed that this type of information was significant and we should proceed to make the proposed deal with them.
 At the time we entered into this deal I, the Justice Department, and the United States Attorney's office, were each aware of the fact that there had been extradition proceedings and that Josette Bauer had been ordered extradited to Switzerland at the conclusion of whatever sentence she would receive in the heroin case. Those extradition proceedings took place in late November of 1967. I was present at that extradition hearing, although I was just an observer.
 I did state to Mr. Hogan and to Bauer and Lambert on every occasion that we discussed the deportation that we would do everything possible to see that they were deported to a country other than Switzerland. I met with Bauer and Lambert many times between 1967 and 1969, and on almost every occasion that we met the subject of their deportation to a country other than Switzerland was discussed. I always told them that the Department of State could throw a wrench into this, but I didn't think that they would in light of the fact that the Swiss Government had not given us any cooperation when we needed it in this investigation. In fact, my information, which was given to me by customs agents, was that the Swiss had not only not cooperated, but had gone out of their way to prevent the extradition of Robert Mori or, at the very least, failed to arrest Mori while surveilling him with knowledge he was under indictment in the United States. Customs agents were quite upset over the failure of the Swiss authorities to cooperate in our investigation, and it was this failure to cooperate that gave all of us in the Department of Justice the feeling that the Department of State would surely go along with the deal that we were making to deport them to some country other than Switzerland, if at all possible.
 With regard to the deportation, I am not certain whether this was part of the original deal. I know at some stage before Customs debriefed Bauer and Lambert we stated that if they cooperated, we would do everything possible to get them deported to a country other than Switzerland.
 There is no doubt that Bauer and Lambert cooperated beyond 100%. They were completely debriefed by U.S. Customs and other officials of the United States Government. Their cooperation led to numerous arrests, indictments and convictions of major narcotics figures in France and the United States. They testified in two major cases and I have been repeatedly told by U.S. Customs officers of the "fabulous" information given by Lambert and Bauer. It was my understanding from customs agents and narcotics agents who have better knowledge of this, that the information supplied by Lambert and Bauer was the beginning of the major breakthrough of the French, Corsican and European narcotic organizations.
 I feel every effort should be made to deport Josette Bauer to a country other than Switzerland. I think it would be a breach of our agreement were the Justice Department and the Department of State not to do everything possible to arrange this.
 Although my memory of the negotiations with James J. Hogan and my conversations with Bauer and Lambert are not complete and I have not had an opportunity to review my Justice Department file on this or the memorandum that Michael Osman and I submitted to the Justice Department concerning Mr. Lambert's deportation, which memo was made in 1969 when the events were fresh in my mind, I do have the abiding feeling that Lambert and Bauer were entitled to believe that the United States Government would make every possible effort to see that they were deported to a country other than Switzerland.
 In my numerous meetings with Josette Bauer and Willy Lambert between 1967 and 1969, they repeatedly expressed concern about whether or not the United States would extradite them to Switzerland. They feared for their lives if forced to return to Switzerland. They understood, however, that it was not an ironclad promise that we would extradite them to a country other than Switzerland. They did understand that our promise was to use our very best efforts to extradite them to someplace other than Switzerland. As time passed they became concerned that, in fact, we were doing nothing; that in fact the Department of Justice had never approached the Department of State; and that we were giving them a lot of "hot air." On many occasions after speaking with them I would call Bill Lynch in Washington and remind him of the fact that we had made a deal that they were to get out in 3 years and that we were to do everything we could to get them deported to someplace other than Switzerland.
 Subsequent to my leaving the Department of Justice in September, 1969, I received a handwritten letter from Willy Lambert, a copy of which is attached hereto, and I wrote a letter to Michael Osman, Assistant United States Attorney, a copy of which is attached hereto. In that letter I referred to a memo which Mr. Osman and I had prepared and submitted to the Department of Justice sometime before September, 1969, in which we expressed our concern that the United States Government was not honoring its deal with Bauer and Lambert. I have not seen a copy of that memo since leaving the Justice Department and I am certain that memo will set forth many of the facts which I am unable to recall at this time. I have had many conversations with Mr. Osman in which we each expressed our concern that the United States Government was not going to live up to the bargain it made with Bauer and Lambert.
 In reviewing the documents attached hereto and certain letters shown to me by you from Willy Lambert to Michael Osman, and from Mr. Lambert to James J. Hogan, and from Michael Osman to William F. Lynch, dated respectively August 13, 1970, July 29, 1970 and May 5, 1970, I can state that the contents of those letters accurately reflect the situation as I recall it.
 Very truly yours, (s) William G. Earle William G. Earle
 WGE:cn
 
 
 [6]
 The United States Attorney was not of counsel on the case, the interests of Switzerland being handled by a privately employed Miami attorney. James Jay Hogan took an active part on behalf of Bauer
 
 
 [7]
 Agent Yarborough denied having made this statement in his testimony. But other evidence of the government's apparent lack of concern for the bargain in 1969 is a memo written by Earle to William S. Lynch, Chief of the Organized Crime Division on August 8, 1969, reminding him of the government's responsibility to Lambert and Bauer which was prompted, according to Earle, by his fears that they would be forgotten. See note 24, infra
 
 
 [8]
 There she ran her own riding school for a time
 
 
 [9]
 In his formal findings the District Judge was positive on both parts of the bargain:
 that a definite agreement was made between the Department of Justice, U.S. Government, which provided that petitioner, together with one Willie Lambert, would receive a maximum sentence of seven years in the penitentiary (with each individual to serve a maximum period of three years before parole), and neither person would be deported to France or Switzerland upon their respective releases from prison.
 
 
 [10]
 At our request, the Department of Justice has supplied us with Bauer's sentence computation record. It shows that she began to serve the escape sentence after she was released by Judge Mehrtens on May 14, 1973
 
 
 [11]
 Since we conclude that the bargain as determined by the District Court fits well within the realm of enforceable constitutional rights of the petitioner, Santobello v. New York, 1971, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, the power of the Secretary of State may well be circumscribed by Reid v. Covert, 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, holding individual constitutional rights superior to the Government's treaty obligations
 
 
 [12]
 Texas and Pacific Ry. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553
 
 
 [13]
 L. Jaffe, Judicial Control of Administrative Action 121-48 (1965)
 
 
 [14]
 Mobil Oil Corp. v. Oil, Chemical and Atomic Workers International Union, AFL-CIO, 5 Cir., 1975, 504 F.2d 272 (en banc) (Brown, C. J., dissenting); J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486; Louisville & N. R. R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887; Agricultural Transportation Assn. of Texas v. King, 5 Cir., 1965, 349 F.2d 873; River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, aff'd, 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334
 
 
 [15]
 Far Eastern Conference v. United States, 1952, 342 U.S. 411, 79 S.Ct. 1210, 96 L.Ed.2d 576; United States Navigation Co. v. Cunard, S. S. Co., 1931, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408; Maritime Board v. Isbrandtsen Co., 1957, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926
 
 
 [16]
 Santobello v. New York, 1971, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427
 
 
 [17]
 See Santobello v. New York, supra at 267, 92 S.Ct. 495, where in a note to his partial dissent Justice Marshall concludes that a majority of the Court held the view that the choice of the defendant should be binding on the Court
 
 
 [18]
 On oral argument, but without record support, we were told that William S. Lynch, head of the Organized Crime Division of the Justice Department, considered that her escape voided the 3-year commitment. But that might well depend upon the factual basis for her actions and particularly her apprehensions based upon her impressions of what Agent Yarborough told her. (See note 7, supra.)
 
 
 [19]
 Scarpa v. U. S. Board of Parole, 5 Cir., 1972, 468 F.2d 31, rev'd, en banc, 1973, 477 F.2d 278, vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44
 
 
 [20]
 See note 10, supra
 
 
 [21]
 United States v. Nixon, 1974, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039
 
 
 [22]
 Since this involves international relations we think our decision on the extent of the Secretary of State's discretion in declining extradition should be postponed. Ashwander v. T.V.A., 1936, 297 U.S. 288, 345-48, 56 S.Ct. 466, 482-84, 80 L.Ed. 688, 710-12 (Mr. Justice Brandeis concurring); Texas v. Grundstrom, 5 Cir., 1968, 404 F.2d 644. Commentators appear to agree he has discretion to review the magistrate's holding that the Treaty requires extradition, although perhaps not absolutely. 4 Hackworth, Digest of International Law § 338 (1942); 4 Moore, International Law Digest § 616 (1906); Note, Executive Discretion in Extradition, 62 Colum.L.Rev. 1313 (1962). As evidence of the Secretary's presumed discretion to extradite a person who is found to be extraditable the government cites Wacker v. Bisson, 5 Cir., 1965, 348 F.2d 602. And the law seems to recognize the power to grant asylum. See, United States v. Rauscher, 1886, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425; United States v. Mulligan, 2 Cir., 1934, 74 F.2d 220
 
 
 [23]
 See generally, Jones v. Cunningham, 1963, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (prisoner on parole in custody for purposes of habeas corpus proceeding); Marden v. Purdy, 5 Cir., 1969, 409 F.2d 784 (one free on bond may be in custody to petition for habeas relief)
 
 
 [24]
 For one asserting a mandatory compliance with Federal Rules of Civil Procedure, the Department of Justice's position is pretty shaky. In its formal answer to the application for the writ it filed a 12-line blunderbuss reply in which it stated:
 The alleged agreement was entered into sometime between August 1967 and April 1973. The parties representing the Government, Michael Osman and William Earle, are no longer associated with the Justice Department. The Government is therefore in no position to admit or deny an agreement with petitioner.
 The only proper remedy for petitioner is to prove the existence of the agreement and its nonperformance.
 If this barely complied with the outlawed general denial, it certainly did not with F.R.Civ.P. 11 in which the effect of the filing of a pleading is a certificate by counsel that it is filed in good faith in the belief that it is well-founded. At the moment of the filing of that "answer" on May 25, 1973, the Department of Justice already had the memo prepared by Earle in August 1969, while he was still employed there, restating the bargain and expressing his fear that it would not be honored and Osman's 1970 letter to William Lynch, Chief of the Organized Crime Division on behalf of Lambert. Mr. Osman was then serving as United States Magistrate in Miami as the United States Attorney's staff well knew. Both of these knowledgeable persons were readily available in Miami to ascertain the facts which were later testified to showing the broken promise.
 
 
 [25]
 We find support for our conclusion in the Proposed Rules Governing Habeas Proceedings, Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (January 1973), promulgated in response to authorization. Reports of the Proceedings of the Judicial Conference of the United States (October 1969). Proposed Rules 2(a) and (b) specify exactly who shall be named as respondent and specifically in terms of successive future custodians. Yet the Proposed Rules do not undertake to comprise a complete system of procedure, Proposed Rule 12. From the draftsmen's specifically designing a new Rule governing joinder, there is a strong indication that they, too, concluded Rule 19 is presently of little, if any, application to habeas proceedings