682 F.2d 487
 AMERICAN TRUCKING ASSOCIATIONS, INC., Southwestern Motor
Transport, Inc., Central Freight Lines, Inc.,
Steere Tank Lines, Inc. and Bowman
Transportation, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 No. 81-4389.
 United States Court of Appeals,
Fifth Circuit.
 July 29, 1982.
 
 Kenneth E. Siegel, Washington, D. C., for American Trucking associations, inc.
 Leroy Hallman, Dallas, Tex., for Southwestern Motor Transport, Inc.
 Maurice F. Bishop, Birmingham, Ala., for Bowman.
 Hugh T. Matthews, Dallas, Tex., for Steere.
 Laurence H. Schecker, I.C.C., Robert B. Nicholson, Atty., Antitrust Div., Dept. of Justice, Washington, D. C., for respondents.
 Raymond J. Salasi, Jr., New Orleans, La., Lloyd M. Roach, Dallas, Tex., John MacDonald Smith, San Francisco, Cal., for intervenor Pacific Motor Trucking.
 Petition for Review of An Order of the Interstate Commerce Commission.
 Before BROWN and RANDALL, Circuit Judges, and DUPLANTIER*, District Judge.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 Pacific Motor Trucking Company (PMT), a motor common carrier and subsidiary of Southern Pacific Transportation Company (SP), a rail carrier, applied for and received from the Interstate Commerce Commission (ICC) a certificate of public convenience and necessity to transport general commodities nationwide. Five protestants before the ICC have filed an action to review and set aside the decision of the ICC in Docket No. MC-78786 (Sub-No. 281) F, Pacific Motor Trucking Company Extension-Nationwide General Commodities. The principal issue raised in the petition for review is whether the "special circumstances" doctrine as applied to a rail-affiliated motor carrier seeking unrestricted motor carrier operating authority continues unchanged in light of the Motor Carrier Act of 1980. Finding that the issue of "special circumstances" is one properly left initially with the primary jurisdiction of the ICC and one which the ICC is currently considering in an administrative proceeding, Ex Parte No. MC-156, Applications for Motors Carrier Operating Authority by Railroads and Rail Affiliates, 46 Fed.Reg. 50, 423 (Oct. 13, 1981), we stay the proceedings in this Court pending final determination of Ex Parte No. MC-156 and certification of that decision to this Court for consideration and decision by this Court on briefs, argument, or both.
 
 Point of Departure
 
 2
 PMT, a wholly owned subsidiary of Southern Pacific, has operated as both an intermodal carrier, carrying freight in conjunction with its parent railroad, and as an over-the-road truck operator in its own right. In September 1980, PMT applied for a certificate for unrestricted nationwide authority, seeking to commence "single responsibility service" by providing intermodal services with railroads other than its affiliate, Southern Pacific, and combining rail and motor carrier operations to provide efficient, fuel-saving alternatives. In support of its application, PMT submitted verified statements from 37 shippers who desired single-line service, generally nationwide. Twenty-eight carriers filed protests in opposition to PMT's application, based on their fear of diversion of traffic if PMT's application was granted. In February 1981, Review Board No. 1 granted PMT's application, finding that PMT was "fit, willing, and able" to perform the service and that "a public need for the proposed service is shown by the evidence in this record." Further, the Review Board determined that the record did not establish any materially adverse effects upon the protestant carriers.[1]
 
 
 3
 From the Review Board's decision, Steere Tank Lines, Inc., Central Freight Lines, Inc.,[2] Bowman Transportation, Inc., and Southwestern Motor Transport, Inc. appealed to the full Commission. The American Trucking Associations, Inc. (ATA) was given leave to intervene. Steere contended that PMT should not have been granted authority to transport commodities in bulk and that the application should have been denied since there was no showing of "special circumstances." In its petition to intervene, ATA also challenged the Board's failure to require or discuss "special circumstances." Finally, Bowman, in its appeal, contended that the grant had been made without required findings and that PMT had failed to establish a prima facie case.
 
 First Stop, the Commission
 
 4
 In August 1981, the Commission, at that time then composed of only four Commissioners,[3] affirmed by an equally divided vote the Review Board's decision, with an opinion which included two concurrences, one concurrence in part and dissent in part, and one dissent. While affirming the grant of authority to PMT, the Commission indicated the necessity of reexamining the "special circumstances" doctrine in light of the Motor Carrier Act of 1980 and the Staggers Rail Act of 1980.[4]
 
 
 5
 Commissioner Gresham, concurring in the decision, indicated that a majority of the Commission could not be attained. His position was that the decision need not reach the "special circumstances" doctrine "(b)ecause special circumstances have been established on the record in this proceeding, a ruling on the survival or demise of the doctrine is unnecessary to the decision here." Commissioner Gresham thought that the opinion should include a review of the Commission's decisions reflecting its application and interpretation of the special circumstances doctrine and explaining why special circumstances had been established in this case. Finally, he stated that the protestants had failed to meet their burden of proof "which is so clearly stated in the Motor Carrier Act of 1980, to show inconsistency with the public interest." Commissioner Gilliam, in a concurrence, indicated that while he was not "advocating that the Commission depart from the special circumstances doctrine", he believed that the 1980 statutory changes had "caused a significant expansion of the doctrine." He also stressed the absence of harm to protestants. In a partial concurrence and dissent, Commissioner Clapp found that PMT had provided sufficient evidence for restricted authority but had failed to meet its affirmative burden of proving special circumstances, a burden placed on an applicant as part of its prima facie case. Chairman Taylor, in a dissent, indicated that PMT had failed to present a prima facie case showing public need and addressing special circumstances.
 
 
 6
 The protestants' subsequent request for a stay of the grant of authority to PMT pending judicial review was denied, again by an equally divided vote, the Commission failing to reach a majority. In October 1981, the Commission filed a Notice of Proposed Policy Statement in Ex Parte No. MC-156 which requested comments on the effect of the recent statutory changes on the "special circumstances" doctrine.[5] The proceeding is still pending, awaiting further action or orders by the ICC, either on the basis of the "record" so far developed or as expanded by virtue of our expressed interest in the importance of the matter and the considered judgment of the Commission.
 
 A Slight Detour
 
 7
 The underlying issue in this appeal is whether and to what extent the "special circumstances" doctrine remains in effect under the Motor Carrier Act of 1980. If the "special circumstances" doctrine retains a role after the statutory changes, there is the subsidiary question of whether the statutory revisions affect the burden of proof of this issue. The "special circumstances" doctrine derives from section 11344(c) of the Interstate Commerce Act, 49 U.S.C. § 11344(c) and the National Transportation Policy, 49 U.S.C. § 10101. Basically the "special circumstances" doctrine reflects the policy against issuing unrestricted motor carrier operating authority to railroads or their affiliates so as to prevent anticompetitive rail control of the trucking industry. The Motor Carrier Act of 1935 prohibited rail acquisition or a merger with a motor carrier "unless ... the transaction ... (would) promote the public interest by enabling such (rail) carrier ... to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." This section was recodified in the Transportation Act of 1940 and eventually formed section 11344(c). The Commission, in granting motor carrier authority to a railroad or rail affiliate, generally restricted the motor operations to those auxiliary or supplemental to rail service.
 
 
 8
 The "special circumstances" doctrine was formulated to allow the Commission to issue unrestricted motor carrier authority to railroads or rail affiliates where the applicant could meet the additional burden of showing that a grant of unrestricted authority did not result in undue restraint of competition and that the public interest required the proposed operation which was not being furnished by independent motor carriers. Through the years, the Commission has carved out several exceptions to the "special circumstances" doctrine. Although the amended Interstate Commerce Act retains the provisions which form the basis for restricting grants of authority to rail affiliated motor carriers, 49 U.S.C. §§ 10101(a) and 11344(c), 49 U.S.C. § 10922(b) has changed the applicable standards for obtaining a grant of motor common carrier authority, lightening the applicant's burden and placing upon the protestants the burden of showing that the proposed service would be "inconsistent with the public convenience and necessity." Even if the "special circumstances" doctrine survives the recent statutory changes, both the Commission and those appearing before it have questioned whether recent statutory changes at the minimum affect the burden of establishing "special circumstances."
 
 Changing Destinations
 
 9
 The doctrine of primary jurisdiction, far from an abdication of judicial responsibility, allows a court when faced with an issue which calls into question an area of special expertise of an agency to suspend proceedings pending referral of the issue to the agency for its official position.
 
 
 10
 The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.... "Primary jurisdiction," ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.
 
 
 11
 United States v. Western Pacific R.R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132 (1956) (citation omitted). In explaining the use of primary jurisdiction in Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the Supreme Court stated:
 
 
 12
 The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.
 
 
 13
 342 U.S. at 574-75, 72 S.Ct. at 494, 96 L.Ed. at 582. The Court also indicated that this technique was originally applied in the context of ICC proceedings.
 
 
 14
 This Court, following the path established by the Supreme Court, has invoked the principle of primary jurisdiction within a variety of contexts,[6] when faced with "an agency statutorily invested with responsibility for the determination and effectuation of policy within the given field which will be affected or influenced by, or influence, the issue posed for Court determination." Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 243 (5th Cir. 1976). When faced with two roads diverging, one leading through the unmarked forest of judicial guesswork and one leading through the clearing of agency expertise, this Court has preferred to take the less traveled by, that of primary jurisdiction. Although primary jurisdiction provides a temporary refuge from a difficult decision, we carefully examine the question presented to us to determine whether the rationale underlying primary jurisdiction applies and whether further determination by the agency will illuminate those issues before us. "What bears continual emphasis is that the Court neither passes off final decision on to another tribunal nor escapes from its ultimate duty to decide. For after the exercise of primary jurisdiction determination by the agency concerned, the case comes back in a suitable way for the Court, as a Court, to act." Usery, 531 F.2d at 241.
 
 
 15
 A significant example of this approach is this Court's action in Tenneco Oil Co. v. FERC, 580 F.2d 722 (5th Cir. 1978), in which we (i) stayed an appeal from a District Court and (ii) approved the continuation of a like directed administrative proceeding pending final decision by the F.P.C. and which is now pending before the Fifth Circuit on petition for review of the F.P.C. order and appeal from the District Court.
 
 Next Stop, the Commission
 
 16
 In this case, the ICC's own actions emphasize the need to invoke primary jurisdiction. The doctrine of "special circumstances," created and transformed by the agency itself, is one raising issues of great public policy, the effect of implementation being within the agency's expertise. The ICC, aware of the need for more information, has issued a policy statement and requested comments from those affected by the regulation. Thus the agency is in a better position to evaluate the various factors involved and to inquire in more depth into the issue of "special circumstances." Unlike this Court, working with a limited record, the agency, with its expertise and access to information, can provide a basis for rational decision when this Court again reviews the issue. In this case, the ICC has already initiated administrative proceedings and is well on its way to formulating a policy. Deferring to the ICC's jurisdiction to determine the effect of statutory revisions on the "special circumstances" doctrine also encourages uniformity. The issue of "special circumstances" has already arisen in several Review Board decisions and is currently pending in some form in three cases before the Tenth Circuit.
 
 
 17
 In addition to the fact that there is currently pending an administrative proceeding before the ICC, we find this case appropriate for primary jurisdiction since the agency, even in the decision here under review, has not spoken authoritatively on the issue of "special circumstances" as affected by the 1980 statutory revisions. The Commission, at the time composed of only four Commissioners, was unable to reach a consensus itself. Two of the four Commissioners involved in the decision, one concurring and one concurring and dissenting, are no longer with the Commission. The Commission presently has six Commissioners, only two of whom were involved in the decision in this case.[7] The Commission, aware of its expertise and of the implications of the "special circumstances" doctrine in further proceedings has made clear its intention to act. With a fuller complement on board, we doubt that the Commission will end up deadlocked as in the previous decision. Presented with broader information and more viewpoints, the Commission will be able to provide an authoritative interpretation of the underlying issues which takes into consideration the full implications of the issue posed for this Court.
 
 
 18
 In light of our determination that the invocation of primary jurisdiction is appropriate in this case, we stay further proceedings in this Court until the ICC has issued its final order or decision in Ex Parte No. MC-156.[8]
 
 
 19
 PROCEEDINGS STAYED.
 
 
 
 *
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 The Review Board stated:
 A public need for the proposed service is shown by the evidence in this record. The supporting shippers have a need for applicant's services in addition to those available from protestants and other existing carriers. The record does not establish that a grant of authority here will have a materially adverse effect upon protestants' operations. We cannot find that a complete grant of the authority sought will impair protestants' operations in a manner contrary to the public interest.... We conclude that the benefits to be derived by the supporting witnesses and the shipping public in general from the authority sought here outweigh any detriment, real or potential, to the protesting carriers.
 Pacific Motor Trucking Co. Extension of Common Carrier Operations, No. MC-78786 (Sub-No. 281) F
 
 
 [2]
 After oral argument in this Court, Central Freight moved to withdraw as a petitioner in the review of the Commission's order, which motion was granted
 
 
 [3]
 At the time of the decision, the Commission consisted of four Commissioners, Chairman Taylor, Commissioner Gilliam, Commissioner Gresham, and Commissioner Clapp. Only two of them presently remain, Chairman Taylor and Commissioner Gilliam. See note 7, infra
 
 
 [4]
 In a footnote to its decision, the Commission stated:
 The arguments raised by the parties on appeal, however, point out clearly the need for us to reexamine the "special circumstance doctrine" as it has been applied to applications involving rail-affiliated motor carriers. This is particularly warranted now in light of the recently enacted Motor Carrier Act of 1980 ... and Staggers Rail Act of 1980.... We believe that a proceeding allowing for notice and public comment (as opposed to an adjudication) is the best vehicle for addressing a question of this magnitude. Accordingly, we will issue a proposed policy statement in the near future requesting comments on these matters.
 
 
 [5]
 In requesting comments on the effect of statutory changes on the "special circumstances" doctrine, the Commission stated:
 It is possible that the applicability of the "special circumstances" doctrine to motor carrier operating rights proceedings has been significantly altered or, that the doctrine is no longer applicable to such proceedings at all. It is the Commission's intention to examine the statutory provisions and existing law to determine whether, and to what extent, the "special circumstances" doctrine is still applicable. In recent proceedings before the Commission, we have noticed a great deal of interest in the subject, and, think that public comments would be helpful in formulating our policy. We, invite comment on whether, or to what extent, the doctrine of "special circumstances" should survive recent statutory changes, and the reasoning which supports those views.
 
 
 [6]
 See Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224 (5th Cir. 1976); (Brown, C. J., concurring, suggesting the use of primary jurisdiction); Geisser v. United States, 513 F.2d 862 (5th Cir. 1975) (analogizing to the use of primary jurisdiction); Mobil Oil Corp. v. Oil Chemical and Atomic Workers International Union, 504 F.2d 272 (5th Cir. 1974) (en banc) (Brown, C. J., dissenting for failure to invoke primary jurisdiction), rev'd, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976); International Paper Co. v. Federal Power Commission, 476 F.2d 121 (5th Cir. 1973) (Brown, C. J., concurring); J. M. Huber Corp. v. Denman, 367 F.2d 104 (5th Cir. 1966); Weymouth v. Colorado Interstate Gas Co., 367 F.2d 84 (5th Cir. 1966); Carter v. American Telephone & Telegraph Co., 365 F.2d 486 (5th Cir. 1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); Agricultural Transportation Association of Texas v. King, 349 F.2d 873 (5th Cir. 1965); Louisville & Nashville R. R. v. Knox Homes Corp., 343 F.2d 887 (5th Cir. 1965)
 
 
 [7]
 At the time of the decision in this case, the Commission consisted of: Chairman Taylor, Vice-Chairman Gilliam, Commissioner Gresham, and Commissioner Clapp. The current Commission members are: Chairman Taylor, whose term expires December 31, 1983; Vice-Chairman Gilliam, whose term expires December 31, 1982; Commissioner Sterrett, whose term expires December 31, 1987; Commissioner Andre, whose term expires December 31, 1987; Commissioner Simmons III, whose terms expires December 31, 1985; and Commissioner Gradison, whose term expires December 31, 1988
 
 
 [8]
 On the issuance of the final order of the ICC, the parties without further leave are to file, as desired, briefs pro and con on the correctness, validity, and effects of the order and the appropriate action for this Court to take